**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 02-22715-CIV-GOLD**

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

 **v.**

**MOUNT SINAI MEDICAL CENTER OF
FLORIDA, INC.,**

   **Defendant.**

_____
_____/

## MEMORANDUM OPINION AND PARTIAL FINAL JUDGMENT ON AMENDED COMPLAINT IN FAVOR OF MOUNT SINAI

## I. INTRODUCTION

The United States seeks in its Amended Complaint **[DE 116-2]**  to recover approximately $2.45 million, plus applicable interest, paid by the Internal Revenue Service in 2000 and 2001 as a refund to Defendant Mount Sinai Medical Center of Florida, Inc. ("Mount Sinai").   That refund represents taxes originally collected from Mount Sinai under the Federal Insurance Contributions Act ("FICA"), 26 U.S.C. §§ 3101 *et seq*., on stipends paid to residents and fellows trained in the graduate medical education programs administered at Mount Sinai from 1996 through 1999.[1]

---

[1] The term "medical student" is typically used to refer to a person who is pursuing a course of study at an undergraduate medical school leading toward a terminal medical degree.  A "resident" is a person who has received a terminal medical or dental degree (*e.g*., M.D., D.O., D.D.S., D.P.M.) and is undergoing further training at the "graduate" level.  The term "intern" is often used to refer to a resident in his or her first year of training after medical school.  Interns are also referred to as postgraduate year-1 or "PGY-1" residents.  Residents in subsequent years are often referred to by their PGY year.  A "fellow" is a term used in some medical specialties, but not all, to designate a resident who has previously completed a certain number of years in a residency program and now is pursuing a fellowship in a subspecialty.  For purposes of this lawsuit, the term "resident," used generally, includes interns and fellows and "residency program," used generally, includes fellowship programs.  (*See* Joint Pretrial Statement (Dkt. No. 164) ("JPTS"), Uncontested Fact Nos. 10 and 12.)

In the alternative, the United States requests that if the Court should determine that the stipends paid to the residents are exempt from FICA taxation, a set off should be provided for such sums as the Defendant received from the federal Center for Medicare and Medicaid Services ("CMA") or the Heath Care Financing Administration ("HCFA"). By agreement of the parties, the refund claim proceeded to trial first, while the set off claim was deferred pending this Court's ruling on the refund claim.

As to the refund claim, the United States seeks a finding that the IRS's refund was erroneous as to **all** residency programs.  As a fall-back position, the United States asserts that certain features differentiated the training among the various residency programs and/or differentiated the resident from one year of training to the next, which would permit this Court to grant partial relief in favor of the United States.

Mount Sinai defends the United States' claim by arguing that resident stipends should not have been subject to FICA taxation because those residents did not provide services that fall within FICA's definition of "employment."  Instead, Mount Sinai alleges that the residents' services fall within the statutory FICA tax exemption for "student" employment; commonly referred to as the "Student Exception."

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. (Internal Revenue Code or "I.R.C.") §§ 7402(a) and 7405.  I.R.C. § 7405 provides for lawsuits by the United States for return of taxes it alleges have been erroneously refunded by the Internal Revenue Service.  In this case, the United States' action for erroneous refund was timely filed under the provisions of I.R.C. § 6532(b).

This matter was tried before the undersigned without a jury on March 3-6, 10-14,

2

and April 3, 2008. This Memorandum Opinion and Partial Judgment is limited to the refund claim. It is based on the admissible evidence introduced at trial, my observations of the witnesses, and the determination regarding the weight to be afforded their testimony; it also constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).[2]

## II. SUMMARY

This case raises the question whether salaries or stipends paid to medical residents or fellows are subject to federal Security and Medicare ("FICA") taxes. The Eleventh Circuit Court of Appeals, in *U.S. v. Mount Sinai Medical Center of Florida*, 486 F.3d 1248 (11th Cir. 2007) has already held that medical residents enrolled in Mount Sinai's Graduate Medical Education Program ("GMEP") are **not ineligible**, as a matter of law, to assert the student exemption to FICA taxation found in 26 U.S.C. § 3121(b)(10).[3] The Eleventh Circuit rejected the Government's "bright-line" rule that medical residents can never be exempted from FICA taxation as students. Id. at 1253. Instead, the Court held that a case-by-case analysis is necessary to determine whether a medical resident enrolled in a GMEP qualifies for the student exemption.

Following the Eleventh Circuit's  mandate, I am now required  to consider whether, under  § 3121(b)(10), Mount Sinai qualifies as a "school, college, or

---

[2]. The parties have filed a Pretrial Stipulation (DE 164) and numerous other trial briefings and submissions (DE #s 169, 173, 174, 196-198, 201 and 203). Mount Sinai also has filed a "Motion to Strike Irrelevant Hearsay Journal Article That Was Neither Introduced Nor Admitted As Evidence At Trial" (DE 202). This motion is denied as moot in that I do not rely on the Journal Article in formulating my findings or legal conclusions.

[3]. The Eleventh Circuit remanded the cause for trial, holding "... the services performed by medical residents are not categorically ineligible for the student exemption from FICA taxation." Id. at 1249-1250.

university," and whether Mount Sinai residents qualify as "students." Id. For reasons set forth in this Order, I find for Mount Sinai, and against the United States,  on both issues.

The heart of the matter is that Mount Sinai, like other teaching hospitals, plays a vital function in today's world of graduate medical education. Without doubt, graduate medical education is absolutely vital to teach inexperience doctors who graduate from medical school how to be sophisticated and accomplished practitioners in a complex world of medical specialization. The purpose of medical residencies in the tax years at issue was to continue the education of medical school graduates so that they can become independent practitioners. No other institutions in the United States, other than teaching hospitals like Mount Sinai, carry out this essential  role and function.  While we may nostalgically remember the days of the family doctor who made house calls, the reality is that the practice of medicine no longer works that way. The vast majority of doctors simply cannot effectively practice and properly care for patients without completing their speciality as residents or fellows at a teaching hospital and becoming board-certified. Without being board-certified, doctors are not entitled to clinical hospital privileges and the opportunity to bill Medicare.[4]

While the United States contends that the "tipping point" for the student exemption for FICA taxes is graduation from medical school (or, alternatively, at the end of the first year of residency which provides eligibility for a state medical license), the more compelling evidence establishes that the actual "tipping point" is the completion of

---

[4] . "By mid-1990's, almost no physicians entered the practice of medicine after only one year of graduate medical education. Rather, to practice medicine in a given field, and in most cases to be admitted to a hospital staff, an individual holding an M.D. degree typically must (1) complete an accredited residency training program of at least three years duration in a clinical specialty field, and (2) become certified by a specialty board that is a member of the American Board of Medical Specialties." *United States v. Mayo Foundation for Medical Education and Research,* 282 F.Supp.2d 997, 1007 (D.Minn. 2003)("Mayo I").

the full residency (or fellow) program in a specialty area at a teaching hospital which marks the end of the formal, supervised, curriculum-directed learning, and the opportunity for doctors to apply for and complete their board-certification in their chosen specialty.

### III. FINDINGS OF FACT

#### A.    Overview of FICA Taxation and the Student Exception

FICA imposes a tax on "wages" that employers pay their employees for the purpose of funding the Social Security Trust Fund.  *See* I.R.C. §§ 3101(a)-(b), 3111(a)-(b); *see also McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 721 (11th Cir. 2002) (describing the FICA tax generally).  There are two subcategories of FICA taxes: a 1.45% tax that supports Medicare, and a 6.2% tax that supports "old age, survivor, and disability insurance."  (JPTS, Uncontested Fact No. 1).

Employers collect FICA taxes by withholding the required amounts from their employees' wages.  *See* I.R.C. § 3102(a).  Employers also pay FICA contributions equal to the amounts withheld from their employees' wages.  *See* I.R.C. § 3111(a). Thus, FICA taxes are "paid in part by employees through withholding, and in part by employers through an excise tax."  *United States v. Lee*, 455 U.S. 252, 254 n.1 (1982).

Wages are defined as "all remuneration for employment," I.R.C. §§ 3101, 3121(a), and FICA broadly defines "employment," in turn, as "any service of whatever nature, performed . . . by an employee for the person employing him, irrespective of the citizenship or residence of either . . . within the United States . . . ." I.R.C. § 3121(b). There are, however, numerous relationships that are exempted from FICA taxation by statutory exceptions to the definition of "employment." I.R.C. § 3121(b).  I.R.C. §

3121(b) lists a number of forms of service that are not "employment" within the meaning of the Act.  Each of the twenty-one numbered subparagraphs sets forth a separate, stand-alone exclusion, including the exception from employment for services performed by a "student."  *See* 26 C.F.R. § 31.3121(b)-4(a) ("Services performed by an employee for an employer do not constitute employment for purposes of the taxes if they are specifically excepted from employment under any of the numbered paragraphs of section 3121(b).").

One of the stand-alone exclusions under I.R.C. § 3121(b) is the Student Exception, found at I.R.C. § 3121(b)(10).  The Student Exception provides that "the term 'employment' . . . shall not include . . . service[s] performed in the employ of . . . a school, college, or university . . . if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university[.]"  I.R.C. § 3121(b)(10).

### B.    Overview of Graduate Medical Education

**<u>Residency Training Generally</u>**

The term "residency program" in the United States refers to offerings in "graduate medical education" ("GME").  In a residency program,[5] the resident receives education and training in a specific medical specialty or subspecialty by participating in a combination of didactic treatment seminars, hands-on patient care, lectures, journal clubs, and other seminars and conferences.  (JPTS, Uncontested Fact No. 11.)

The ultimate objective of residency programs is to ensure that the residents will acquire the knowledge base and the experience to manage the common problems in

---

[5] It is well-accepted in the GME community that the term "residency programs" includes fellowships. (Mar. 12 Tr. at 26-27. 94.)

their specialty and function independently.  (Mar. 11 Tr. at 30, 117.)  It is generally accepted that physicians are not deemed fully trained to independently practice medicine in a specialty or subspecialty without <u>completing</u> a residency program.  (Mar. 11 Tr. at 38, 93.)   Moreover, satisfactory completion of a residency program also is mandatory for physicians to become eligible for "board certification" and to be credentialed (*i.e.*, receive privileges) at the vast majority of hospitals.   (JPTS, Uncontested Fact No. 35; *see* Mar. 11 Tr. at 20.)

### Board Eligibility, Board Certification, and State Licensure

"Board certification," as mentioned above, refers to certification by medical boards, which are standard-setting organizations whose common "mission … is to ensure that those individuals that attain the certification status have, in fact, achieved a level of competency in their profession that fulfills the public's expectation for well functioning, practicing physicians."  (Mar. 11 Tr. at 99-100.) For example, the American Board of Internal Medicine ("ABIM") is the certifying board for internal medicine, and has the responsibility for establishing the standards for certification as an internist, as well as the standards for certification in all internal medicine subspecialties (*e.g.*, cardiology, hematology, and nephrology).  (*Id*. at 99.)  Like other medical boards in their respective specialties, the ABIM establishes the certification exam for internal medicine and each subspecialty, which is then taken by board-eligible physicians (*i.e.*, those physicians that have satisfactorily completed an accredited residency program).  (*Id.*)  If a resident chooses to further train in a subspecialty area, that resident typically will take the certification board in their specialty while studying as a fellow.  (Mar. 11 Tr. at 57.)

Even if that physician obtains board certification in the specialty (*e.g.*, internal medicine), he or she cannot practice in the subspecialty (*e.g.*, cardiology) without first completing fellowship training in the subspecialty (thus attaining board eligibility in that subspecialty too).[6]  (*Id.* at 57-58.)

### Teaching Hospitals and Faculty

The location where residency programs are offered is generically called a "teaching hospital."  Most residency programs are offered by a hospital or singular entity that is a medical center.[7]  (Mar. 11 Tr. at 84-85.)

Physicians hired to the "medical staff" at a hospital are referred to as "attending physicians" (or simply, "attendings").[8]  (JPTS, Uncontested Fact No.13.)  An attending physician is fully licensed and has "privileges" at the hospital (based on credentialing) to practice within the permitted constraints of his or her medical specialty.  (*Id.*)  Attending physicians with responsibility for supervision of residents are deemed teaching "faculty,"

---

[6] In the earlier twentieth century, the vast majority of doctors did just one year of training after medical school, which intern year was called a "rotating internship" – so-termed because interns rotated during the year through a period of obstetrics, a period of pediatrics, a period of surgery, and a period of internal medicine – and then went into practice, after passing the state licensure exam, as a general medicine practitioner (or simply "general practitioner").  (Mar. 11 Tr. at 39-40, 48.)  Still, the general practitioner could not practice a specialty, such as internal medicine or obstetrics, for example, but only general medicine.  (*Id.* at 40-42.)  Over time, the general practitioner has disappeared; indeed, it has not existed since the 1970s.  (*Id.* at 46-47.)  The "field is too big and too complicated," and it became unsafe to practice as a general practitioner.  (*Id.* at 47.)  In the modern practice of medicine, someone holding themselves out as a general practitioner would have no possibility of obtaining hospital privileges.  (*Id.* at 46.)  Notably, a  "general practitioner" is not the same as a "family medicine" practitioner; family medicine is a specialty, which takes three years of training to qualify.  (*Id.* at 44.)  Thus, although residents may obtain state licensure as soon as they complete their PGY-1 year if they pass Part III of the United States Medical Licensing Exam, licensure does not enable them to practice medicine in the specialty for which they are training and, therefore, is of no real significance.  (*Id.* at 39-49.)

[7] In the rarer instance, an undergraduate school of medicine and medical center are co-located, with the medical center offering the residency program for residents at the graduate level and the neighboring medical school training undergraduate medical students.  (Mar. 11 Tr. at 85.)  A hospital may have residency programs for some or all of its departments; *e.g.*, it "may have a surgery residency and an internal medicine residency, but no radiology residency, though they have staff radiologists there reading x-rays."  (*Id.* at  86.)  Of course, non-teaching hospitals offer no residency programs.  (*Id.*)

[8] Residents are commonly referred to as "house staff," rather than the term "medical staff" reserved for attending physicians.  (Mar. 3 Tr. at 61-62, 100-101.)

(Mar. 11. Tr. at 34), and are drawn to teaching hospitals "because they like to teach and it is that teaching role that's the draw." (*Id*. at 55.) Conversely, residents make faculty attendings less efficient: Faculty uniformly believe they can perform medical tasks more easily alone than while training the resident. (*Id*. at 55-56, 130-31.) This inefficiency created in the teaching hospital environment is recognized by Medicare, which provides a payment to teaching hospitals over and above that which is typically provided for a given patient care service; in part, due to its recognition that teaching hospitals' efficiency is diminished by the presence of residents. (*Id.* at 130-31.) However, these Medicare payments are "substantially less" than what it costs the hospital to operate the residency program. (*Id*. at 131.)

### Training:  From Undergraduate Medical School through Residency

A residency program is an extension of a medical student's formal education. (*See* Mar.  11 Tr. at 19-20, 103.)   At the outset of undergraduate medical school, medical school students are novices, and by graduation, they typically have the status of an "advanced beginner" in terms of medical competence. (Mar. 11 Tr. at 36.) Beginning in the third year of medical school, medical students typically begin to interact with patients in the hospital wards as part of a system called "rotations." (Mar. 11 Tr. at 115-16.)  That involvement increases as the academic year progresses, and throughout the third year, the medical student will typically rotate through the core disciplines of medicine, surgery, family medicine, pediatrics, obstetrics and gynecology, often with electives in neurology and some of the surgical subspecialties, anesthesiology." (*Id*. at 116.)  This initial introduction into the various disciplines of medicine is not only part of the "learning process for the medical student, but it also

affords the student an opportunity to begin to identify what specific area of medicine they will choose to pursue throughout their career." (*Id.*) The third-year course of study focuses largely on "general patient care skills and exposure to the various specialties," and students are likely to see one or two patients at a time. (*Id.* at 30.) The fourth year of medical school sees "more intensive immersion in the clinical setting," with "more responsibility" – "perhaps three or four [patients] at a time." (*Id.*) Many, if not most, medical schools also require a "subinternship" in one of the core disciplines; so-designated "because the medical student actually functions in that setting much like an intern" in his or her PGY-1 year. (*Id.* at 116.) "They are part of a team of trainees and attendings in the hospital that are involved in the patient care activities of that particular discipline." (*Id.*) Regardless of medical school year, medical students "do[] their patient care under the direct, immediate, constant supervision of a whole set of more senior physicians." (*Id.* at 30.)

Those patient care activities that occur in the third and fourth years of medical school, are "quite analogous" to what happens "for the period of residency training." (*Id.* at 117.) The distinguishing characteristic of residency training is that "there is progressively more and more responsibility that the resident takes on, him or herself, … as they progress through their residency training" (*id.* at 117), but always under the supervision of the attending faculty. "[I]t is that progressive responsibility and a planned exposure to patients of different types in different settings with the associated teaching that's the heart of the residency experience." (*Id.* at 32.)

Residency programs may administer admissions to their programs through a write-in application process (Mar. 12 Tr. at 171) or through the "National Resident

Matching Program"  (Mar. 11 Tr. at 106-08; Mar. 12 Tr. at 66;  Ex. N14 at MS 067841-42).   Under the National Resident Matching Program, the medical student chooses a number of hospitals that offer programs in his or her selected specialty.   The student then visits the hospitals and, if interested in the program, fills out an entrance application, takes tests, and/or is interviewed, according to the requirements of the hospital program.   The dean of the student's medical school then sends transcripts, performance evaluations, and letters of recommendation to the directors of the hospital programs to which the student has applied.   After the visitation and interviewing period has expired, each medical student ranks in order of preference the hospital programs he or she has selected.   Correspondingly, each hospital program ranks the students it has interviewed.   The preferences of the hospitals and students are then matched in order of preference by computer, resulting in a "match"  between student and hospital. The matches are announced simultaneously across the country on a specified date in the first quarter of each year. (JPTS, Uncontested Fact No. 38).

Medical school graduates apply for graduate training in a residency program on the basis of their academic record, and assess residency programs based on their ability to "support their further education."  (*Id*. at 36-37.)  "[Residents] are concerned about the relationship and support and mentoring that they will have from the faculty in their residency program."  (*Id.*)  Typically, a new resident has "only an extremely rudimentary command of the knowledge base in terms of procedural skills," and "they depend on a carefully planned and structured program" over the course of the residency program.  (Mar. 11 Tr. at 30-31.)  When a resident is picking residency programs, he does not view the process to be one of picking his first "job."  (*Id*. at 71.)

In fact, "[n]o medical student would say their residency is their first job."  (*Id.*)  The medical student/aspiring resident looks at residency training as an element in his or her education in the same way high school students, when applying to college, judge whether "a degree from college A or a degree from college B [is] going to help [them] more."  (*Id.* at 69.)  Residents thus think of residencies as education and not "on-the-job training."  (*Id.* at 81.)  Teaching hospitals and residents know from the outset of their training that residents that enroll in a particular program are not likely to stay on staff as an attending physician after completion of their residency.  (*Id.* at 132.)  Ultimately, residency programs are training for the physician's first job – *i.e.*, "[t]here always is a next step after residency."  (*Id.*)  Conversely, one's first job in medicine could be their only job.  (*Id.*)

### Educational Content and Administration of Residency Programs

The premise behind a residency program is to permit residents to become independent practitioners in their chosen specialty upon the completion of the program, which occurs through "a series of rotations that are planned and progressive in terms of the challenge of the rotation and the resident's role with respect to the care of patients."  (*Id.* at 31.)  A PGY-1 resident "is exposed typically to relatively straightforward and common problems.  If he or she is in a more complex environment with more unusual or challenging clinical problems, there will be more supervision and more teaching opportunities."  (*Id.*)  The resident moves through a "series of clinical rotations, each of which has a substantial amount of informal and formal teaching associated with it."  (*Id.*)  In that way, the resident "profits from both the experience of taking care of patients under supervision and the associated teaching."  (*Id.*)  As a result, "[t]he resident's

command of medicine increases and the resident's level of responsibility progresses." (*Id*.)  Residents also are exposed to more traditionally "didactic" experiences, which "create an opportunity for residents who are getting a lot of experience to step back and reconnect with pathophysiology or think about clinical science."  (*Id*. at 33.)

Groups of residents move through the residency program and the curriculum together as a class.  There are formal assessments of residents' progress.  Beyond the teaching faculty, residencies employ educational administrators to administer the programs.  All residency programs are evaluated on how well their residents perform, and how successful residents are after the completion of their residency.  (Mar. 11 Tr. at 53-56.)

Residents receive what is commonly termed a "stipend" as part of their residency.  These stipends "are geared to maintaining a minimum standard of living during the period of time that [the residents] are engaged in their education.  Dictated by the Accreditation Council for Graduate Medical Education ("ACGME"), the stipend is not designed to reward them or to compensate them for the nature of what they are doing, but simply to provide them, … a means of maintaining body and soul while they are engaged in their training."  (Mar. 11 Tr. at 112; *see also* Mar. 12 Tr. at 67-68.)

The "training requirements" for a particular specialty or subspecialty are established by the applicable "certifying board."  (*Id*. at 99.)  The specific content and structure of the "planned, progressive curriculum" (*Id*. at 53) for residency training is dictated by national accrediting organizations.  (*See* Mar. 10 Tr. at 51 ("Mount Sinai, and all residency programs, are required to have a curriculum"); *see also* Mar. 10 Tr. at 101-103.) The term of engagement within the institution offering the residency program

is set nationally by the number of years required to complete accredited training; it is not a matter of local discretion.  (JPTS, Uncontested Fact No. 39.)

**Accreditation of Residency Programs**

The process of accreditation determines whether an educational program is in substantial compliance with established educational and other standards of the accrediting body.  (JPTS, Uncontested Fact No. 31.)  In order to maintain accreditation, accredited residency programs undergo regular internal and external review to ensure that they abide by and comply with the accrediting body's standards.   (JPTS, Uncontested Fact No. 34.)

Accreditation is significant on a number of levels.   In the vast majority of instances, program accreditation is required for a residency program's graduates to be eligible to become board certified in a medical specialty or subspecialty.  (JPTS, Uncontested Fact No. 33.)   Program accreditation also is required for federal reimbursement of residency training costs under Medicare.  (JPTS, Uncontested Fact No. 32; *see also* Mar. 12 Tr. at 15-25.)

The most prominent national accrediting organization has been the ACGME. Although the graduate phase of physician preparation has always been educationally oriented, the ACGME has become a major driving force in the standardization of robust educational curricula across all teaching hospitals.  (Mar. 12 Tr. at 10-12.)  The ACGME is a voluntary association formed by five member organizations: 1) the American Board of Medical Specialties[9]; 2) the American Hospital Association; 3) the American Medical Association; 4) the Association of American Medical Colleges; and 5) the Council of

---

[9] The American Board of Medical Specialties is the "umbrella organization for all of the certifying boards." (Mar. 12 Tr. at 14.)

Medical Specialty Societies.  (JPTS, Uncontested Fact No. 28.)   The ACGME has a board of directors, which includes among its membership a representative from the United States Department of Health and Human Services ("HHS") with nonvoting status, who is there to communicate initiatives of the federal government and to hear the deliberations of the ACGME.  (Mar. 12 Tr. at 14-15.)   The HHS nonvoting representative sits on the board, from the ACGME's perspective, because Medicare reimbursement related to GME is contingent on ACGME accreditation.[10]  (*Id*. at  15-16.) Consequently, the ACGME's work is very important to the federal government's decisions and the ACGME wants them to be "in the room hearing the discussions" regarding GME standards for accreditation.  (*Id*. at 16.)   The government does not control the ACGME in any way, however, and the ACGME does not try to coordinate policy with federal agencies such as Medicare or otherwise lobby the government for fear it would "dilute or threaten [the ACGME's] educational standards."  (*Id*. at  15.)

"The mission of ACGME is to improve patient care by improving the education of residents through accreditation."  (Mar. 12 Tr. at 11.)  The ACGME accomplishes this mission through the creation of standards for residency programs in the various specialties and subspecialties, and the regular review of residency programs to determine compliance with those standards.  (Mar. 12  Tr. at 11-12; *see generally* Ex. N14 (ACGME "Green Book").)

ACGME accreditation involves the accreditation of the residency program itself (in accordance with specified "Program Requirements"), including the institution that sponsors the program (through "Institutional Requirements").  (Mar. 12 Tr. at 11-13.)

---

[10] In other words, "if ACGME has accredited a program, they are eligible for Medicare [GME] reimbursement.  If ACGME withdraws accreditation, they are no longer eligible for Medicare reimbursement."  (Mar. 12 Tr. at 16.)

Residency programs submit to ACGME a program information form ("PIF").  (*Id*. at 11.)
The ACGME also surveys residents to ascertain an institution's compliance with
accreditation standards.  (*Id*. at  11-12.)  And the ACGME tracks residents' experiences
through case logs.  (*Id*. at  12.)  That information is provided to another arm of the
ACGME, which conducts site visits (2100 per year) and gathers data in a report
concerning the residency programs to judge compliance with accreditation standards.
(*Id*.)  All of the collected data is then reviewed by residency review committees ("RRCs"),
who are "experts in their specialty and in education within their specialty," and they make
a determination whether the program is in substantial compliance with ACGME's
published standards.  (*Id*. at  12-13.)

The ACGME promulgates its written standards in a yearly publication titled the
Graduate Medical Education Directory – known within the GME community simply as
the "Green Book."  (Ex. N14.)  Institutional and Program Requirements are contained in
"Section II - Essentials of Accredited Residencies in Graduate Medical Education:
Institutional and Program Requirements."  (*Id.*)  Among the institutional requirements for
any hospital offering an ACGME-accredited residency program is the requirement of a
graduate medical education committee, with resident representation, which serves as
an interface between the residents and the institution.  (Mar. 10 Tr. at 15-16; Ex. N14 at
MS 067848-49).  While the Institutional Requirements provide the basic foundation for
all residencies, the program requirements define the educational objectives and policies
specific for each specialty.  (*See generally* Ex. N14.)  Among its exhaustive contents,
the Green Book specifies qualifications for the facility, the designated residency
"program director," the curriculum (including a "formal teaching program"), patient care

responsibilities, required evaluative components, teaching responsibilities, and certification upon graduation from the program. (*See generally* Mar. 12 Tr. at 32- 34; *passim* (testimony of Dr. David Leach concerning contents and purpose of the Green Book (Ex. N14), and each ACGME-accredited residency program offered at Mount Sinai generally).)

Adherence to the ACGME curricula is mandatory, just as is adherence to the ACGME program and institutional requirements. (JPTS, Uncontested Fact Nos. 27, 29; Mar. 10 Tr. at 16-17; Ex. N14.)  The standards require residents to attend conferences and lectures and to engage in laboratory and research.  (JPTS, Uncontested Fact No. 27; *see, e.g.,* Ex. N14 at MS 067904; MS 067907.)  Scholarly activity by faculty as well as by residents is required.  (JPTS, Uncontested Fact No. 27; Mar.10 Tr. at 110.)  The ACGME also requires sponsoring institutions to provide all residents with appropriate financial support and benefits.  (JPTS, Uncontested Fact No. 32; Mar. 12 Tr. at 67-68.)

ACGME standards also require that the educational goals of the residency program and learning objectives of the residents must not be compromised by excessive reliance on residents to fulfill institutional service obligations.  (JPTS, Uncontested Fact No. 37.)  To protect those learning experiences, the ACGME protects the time and guarantees the resources for learning to occur.  (*Id*. at 50.)  Moreover, the ACGME's Institutional Requirements specify that "[s]ponsoring institutions must provide services and develop systems to minimize the work of residents that is extraneous to their educational programs. . . ."  (Ex. N14 at MS 067851; *see also* Mar. 12 Tr. at 41.)  As a result, hospitals ensure that allied healthcare personnel perform ancillary procedures that have no "educational value" in the residency context (for example, "the

hospital must have an intravenous phlebotomy messenger transporter service so residents are not consumed doing that").  (Mar. 12 Tr. at 41.)   Any failure to do so jeopardizes the accreditation status of all residency programs sponsored by the institution. (*See* Ex. N14 at MS 067848).

Importantly, however, patient care is  an "essential" component to the education of residents.  (Mar. 11 Tr. at 32; *see also id.* at 64, 120-21, 133.)  For example, the ACGME requires each resident receive "meaningful patient responsibility."  (Mar. 12 Tr. at 46-47; Ex. N14 at MS 067903-04.)  Throughout, the ACGME abides by the model of "progressive responsibility":  "The program must ensure, with each year of training, that each resident has increasing responsibility in patient care, leadership, teaching, and administration."[11]  (Ex. N14 at MS 067904.)

The teaching that occurs at the patient bedside, in the clinical environment, is "the key learning environment for residents."  (Mar. 11 Tr. at 120-21.)  "The education of the resident at a patient's bedside is absolutely critical.  It's the core to the preparation and education of physicians for independent practice."  (Mar. 11 Tr. at 133.)  That reflects "the ultimate purpose of residency education[, which] is to insure that residents have sufficient experience with the actual care of patients so that they can be judged competent to carry on those activities in an independent way."  (*Id.*)  Thus, "[t]he nature of medical education of necessity is intimately involved in direct care of patients."  (*Id.* at 122.)  The patient's bedside can accurately be called the predominant "classroom" for residents and for third and fourth year medical students alike.     (*Id.* at 121.)  For

---

[11] The ACGME also acknowledges, however, that for one to acquire "practical skills" to practice independently as a physician, one needs "practical experiences."  (Mar. 12 Tr. at 46-48 (noting that the ACGME requires internal medicine residents to literally "write orders" in order to develop and refine that ability).)

example, the operating room experience is not something you can experience by looking at a video or hearing a lecture.  (*Id*. at 125.)  Thus, the learning experience is heightened through the actual hands-on activities of the resident.  (*Id*.)  Ultimately, the only way to ensure the competence of practicing physicians is to ensure that as residents, they have engaged in appropriate patient-care activities under the supervision of an attending physician "to the point where they can be judged to be independently competent."  (Mar. 11 Tr. at 133-34.)

The essential features of program accreditation by the ACGME are closely approximated by the other national accrediting organizations.  (*See* Exs. K7, L7, T7; Mar. 10 Tr. at 91).  Like the ACGME, these organizations prescribe a mandatory curriculum for each specialty and subspecialty.  (Ex. K7 at MS 067051-55; Ex. L7 at MS 067113-14; Ex. T7 at MS 067719-25.)  Like the ACGME, the programs must provide financial support and benefits pursuant to a contract.  (Ex. K7 at MS 067047-48; Ex. L7 at MS 067112; *see* Ex. T7 at MS 067716)  Qualified faculty attendings supervise the resident pursuant to the progressive responsibility model.  (*See* Ex. K7 at MS 067050-51; Ex. L7 at MS 067110; Ex. T7 at MS 067728-30.)  Each such accrediting organization also follows the ACGME's priority of education over service.  (*See, e.g.,* Ex. L7 at MS 067105.)  The preeminence of education over service is also reflected in the educational model of rotations in residency programs, which presumes that the educational curriculum, and not a "service" need, dictates the training of a resident. (*See, e.g.,* Mar. 10 Tr. at 85, 89; Mar. 12 Tr. at 69-70; Mar. 13 Tr. at 64-65).

**IV.   Mount Sinai Medical Center of Florida, Inc. and Its Residents**
     **<u>Mount Sinai and Its Educational Mission</u>**

Mount Sinai is located in Miami Beach, Florida, which is within this judicial district.  (JPTS, Uncontested Fact No. 3.)  At all times during the tax years in question, Mount Sinai was a private, independent, not-for-profit teaching hospital, and also a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code.   (JPTS, Uncontested Fact No. 4.)  Mount Sinai Medical Center was created in the late 1940s, by a group of physicians and local business people on Miami Beach."  (Mar. 10 Tr. at 10.)  "[I]t was the belief of the founding individuals that [Mount Sinai] should be an institution that was committed to education, committed to research and advancing knowledge, and committed to providing charitable care."  (*Id.*)  During the 1996-1999 tax years in question, Mount Sinai's mission statement read, in part, as follows:  "Our mission is to provide quality health care enhanced through education, research, teaching and volunteer services."  (Ex. B1.)

From 1996-1999, Mount Sinai operated under the name "Mount Sinai Medical Center of Greater Miami, Inc." and functioned as a 707-bed acute care hospital.  Mount Sinai also maintained a teaching affiliation with the University of Miami School of Medicine, and rendered services to patients, including Medicare and indigent patients, on an inpatient and outpatient, emergency and clinic basis.  (JPTS, Uncontested Fact No. 6.)  Mount Sinai operated under a President (the Chief Executive Officer) and a Board of Trustees, and functioned as a tertiary referral center for the Southeastern United States, the Caribbean, Central and South America, and for the Northern United States during the winter season.  (JPTS, Uncontested Fact No. 4.) As an international medical center, Mount Sinai had during 1996 through 1999, and continues to have,  a special commitment to the educational needs of Latin American countries and their

physicians.  (JPTS, Uncontested Fact No. 4.)  At the time, Mount Sinai was the only hospital in Florida with   a Cyclotron facility, enabling Mount Sinai to conduct research in the field of Nuclear Medicine.   Other research areas included Magnetic Resonance Imaging and Computer Tomography Ultrasonography.  Physicians at Mount Sinai were active in researching a variety of areas, including AIDS, breast disease, electrophysiology, dermatological disorders, monoclonal antibodies, pacemakers, pain management, pulmonary medicine, and sleep disorders.  (JPTS, Uncontested Fact No. 8.)

In pursuit of its education, teaching, and research missions, Mount Sinai operated a "Department of Medical Education," run by a full-time Director of Medical Education.  (JPTS, Uncontested Fact No. 53; Mar. 10 Tr. at 66; Mar. 14 Tr. at 102.) The Department of Medical Education was divided into three areas of education: undergraduate, graduate, and continuing medical education.  (JPTS, Uncontested Fact No. 53; Mar. 14 Tr. at 102.)  Mount Sinai employed a "coordinator" for each of these three areas, who reported to the Director of Medical Education.  (JPTS, Uncontested Fact No. 53; Mar. 14 Tr. at 102; Mar. 10 Tr. at 13-14.)   Mount Sinai operated a "campus," where various components of the medical center are located.  (*See* Apr. 3 Tr. at 52.)  Undergraduate medical students at nearby medical schools (including Nova Southeastern University and the University of Miami) rotated into Mount Sinai through affiliation agreements signed and negotiated between Mount Sinai and the various institutions.  (Ex. 4-7.)  Mount Sinai also maintained affiliation agreements with hospitals to permit other residents to perform rotations at Mount Sinai for education and training purposes (Exs. D1 and E1), and also allow Mount Sinai's residents perform rotations at

other hospitals.  (Exs. C1, F1, G1, H1, I1, J1.)  This is so that residents as part of their education and training at Mount Sinai could have the broadest possible exposure to various patients, diseases and conditions. (*See* Mar. 10 Tr. at 59 (Dr. Katz testifying regarding an external rotation in trauma that Mount Sinai offered its emergency medicine residents:  "One of the things that the accrediting agencies require is that if a program in an institution wishes to establish an external rotation, that it is done so to meet the educational needs of the program.  Hialeah Hospital is a much different hospital than Mount Sinai Medical Center, a lot of trauma, a large under served population, and it was felt that this exposure would compliment the activities that the residents experienced both at Mount Sinai and at Jackson.")

### Mount Sinai's Residency Programs From 1996-1999

#### a.    Overview

From 1996 through 1999, Mount Sinai sponsored graduate medical education programs   in twelve medical or dental specialties.  Those specialties included dentistry, emergency   medicine, general surgery, internal medicine, pathology, podiatry, and radiology; and      fellowships in breast imaging, cardiology, surgical oncology, plastic surgery, and sleep disorders.  (JPTS, Uncontested Fact No. 14.)   The residency programs ranged from one to five years in length.  (JPTS, Uncontested Fact No. 47.) Mount Sinai was at the time (and remains to this day) one of six statutory teaching hospital in the state of Florida.  (Mar. 10 Tr. at 9-10; Apr. 3 Tr. at 137-38.)  A statutory teaching hospital in Florida must have 100 or more residents or fellows enrolled and offer three or more residency or fellowship programs."  (Mar. 10 Tr. at 9-10.)   Mount Sinai

offers and maintains its residency programs even though it is not profitable for the hospital to do so.[12]

Each of the individual residency programs was led by a "program director," who was a "faculty member chosen by the institution to have direct oversight of the residency program." (*Id*. at 14.)  Each program director had to meet the criteria set forth by the accrediting organization for that medical specialty.  (*Id*.)  The program director was assisted by a non-physician staff member, called a "program coordinator," who helped administer the residency program.  (*Id*.)  Mount Sinai's Department of Medical Education had primary responsibility for "oversight of all the programs, ensuring compliance, enrolling the residents, ensuring that the accreditation standards [were] met, [and that] evaluations [were] maintained." (*Id*.)

Attending physicians who had teaching responsibility for a resident in training were known as "faculty" at Mount Sinai.  (*Id*. at 15.)  Faculty were practicing physicians with privileges at Mount Sinai and subject to standards and requirements of the relevant accrediting organizations, including the ACGME.  (*See id*. at 15, 184; Mar. 12 Tr. at 90).

The Department of Medical Education also established a graduate Medical Education Committee ("MEC"), which oversaw the residency programs at Mount Sinai. It met at least six times per year.  A primary responsibility of the MEC was to ensure compliance with the accreditation standards of the various accrediting bodies.  Toward that end, the MEC established a "Review Committee" to conduct a review and analysis of each training program approximately every two to three years.  (JPTS, Uncontested

---

[12] Residency programs cause Mount Sinai to operate less efficiently in many respects.  (Mar. 10 Tr. at 220-21; Mar. Tr. at 10-11, 55-56; Mar. 12 Tr. at 119; Mar. 13 Tr. at 65; Apr. 3 Tr. at 149–53; *see also* Mar. 11 Tr. at 130.)  As a general matter, for-profit hospitals do not offer residency programs. (Apr. 3 Tr. at 153-56.)  Only a minority of hospitals nationwide offer residency programs.  (Mar. 11 Tr. at 130.)  Mount Sinai lost money in the aggregate from 1996 to 1999 and accepted a transfer from its charitable foundation, totaling $17 million, to cover partially the loss.  (Apr. 3 Tr. at 141-42.)

Fact No. 53; *see also* Mar. 10 Tr. at 93; Mar. 12 Tr. at 169-70).  The MEC's actions were governed by the various accrediting bodies, including the ACGME.  (Mar. 10 Tr. at 15.)

At all times relevant to this case, Mount Sinai's residency programs in internal medicine, radiology, general surgery, cardiology, and pathology were accredited by the ACGME; its residency program in dentistry was accredited by the American Dental Association ("ADA"); its residency program in emergency medicine was accredited by the American Osteopathic Association ("AOA"); its residency program in podiatry was accredited by the Council on Podiatric Medical Education ("CPME"); and its residency program in sleep disorders was accredited by the American Sleep Disorders Association ("ASDA").[13]  All five accrediting organizations are independent, national organizations having among their purposes the oversight of, and the prescribing of standards for, graduate medical and dental education programs.  (JPTS, Uncontested Fact No. 48.)

Accreditation was not available in the subspecialty areas of breast imaging and surgical oncology fellowships.  Both programs were supervised, however, by attending physicians with privileges at Mount Sinai.  (JPTS, Uncontested Fact No. 49.)  Mount Sinai's plastic surgery residency program also was not accredited at the time, but it too was supervised by an attending physician with privileges at Mount Sinai.  (JPTS, Uncontested Fact No. 50.)

Over the tax years 1996-1999, the cumulative enrollment by program was as follows:

| Residency Program | Enrollees/Participants ('96-'99) |
|---|---|

---

[13] Mount Sinai has never lost its accreditation for any residency program.  (Mar. 10 Tr. at 32-33; *Id.* at 200.)

| | |
|---|---|
| Internal Medicine | 99 |
| Radiology | 46 |
| General Surgery | 45 |
| Dental | 29 |
| Cardiology | 22 |
| Pathology | 20 |
| Emergency Medicine[12] | 10 |
| Breast Imaging | 7 |
| Podiatry | 6 |
| Sleep Disorders | 4 |
| Plastic Surgery | 3 |
| Surgical Oncology | 3 |

(JPTS, Uncontested Fact No. 46.)  In sum, Mount Sinai enrolled 294 residents over the four tax years, and 281, or nearly 96 percent, were programs accredited by the appropriate accrediting institution.[14]   (*See* Mar. 10 Tr. at 60-61, 64-66; JPTS, Uncontested Fact Nos. 49-50.)

At any given point during the tax years of 1996-1999, Mount Sinai's residency program included approximately 120-140 residents.  (JPTS, Uncontested Fact No. 44.) The residents' academic year at Mount Sinai ran from approximately July 1 through June 30th of the following year.  (JPTS, Uncontested Fact No. 45; see, e.g., Mar. 10 Tr. at 20; Mar. 4 Tr. at 234; Mar. 5 Tr. at 75; Mar. 6 Tr. at 145; Mar. 10 Tr. at 219; Mar. 13 Tr. at 57, 155; Apr. 3 Tr. at 58.)

---

[12]  The emergency medicine residency did not begin until the 1998 academic year.

[13]  The 13 residents in non-accredited residencies participated in programs patterned after, if not practically identical to, the accredited programs.  (Id.)

Common to all twelve programs was a formal curriculum, the content of which complied with standards set by the various accrediting organizations.  (*See* Mar. 10 Tr. at 51 ("Mount Sinai, and all residency programs, are required to have a curriculum"; *see also* Mar. 10 Tr. at 101-103.)  The program directors of each specific residency program designed the program curricula pursuant to mandated standards set forth by the respective accrediting bodies.  (*See, e.g.,* Mar. 5 Tr. at 128; Mar. 10 Tr. 210-11; Mar. 12 Tr. at 95; Mar. 13 Tr. at 57-58; *see also* Mar. 10 Tr. at 14 (explaining that program directors ensure program compliance with accrediting agencies).)  In order to maintain accreditation, Mount Sinai's program directors prepared and submitted exhaustive documentation of the program's educational nature.  (*See* Exs. K1, Y4, O1, L5, N8, X1, C7.)  The ACGME's standards and influence were pervasive at Mount Sinai.  (*See, e.g.,* Mar. 10 Tr. at *passim* (Testimony of Paul Katz)).

Residents received a certificate of completion indicating the successful completion of the graduate medication education program at Mount Sinai.  (JPTS, Uncontested Fact No. 55.)  Certificates were awarded at an annual "graduation ceremony," which was held for all twelve residency programs.  (*See, e.g.,* Mar. 10 Tr. at 114-15; Mar. 14 Tr. at 171-73.) All residents were eligible for selection for the award of "resident of the year."  (Mar. 10 Tr. at 115.)

Upon the successful completion of any of Mount Sinai's accredited residency programs other than the dentistry residency program, residents became board eligible. (JPTS, Uncontested Fact No. 56.)  Dentistry residents enrolled in Mount Sinai's one-year general practice residency ("GPR") in dentistry because they felt unprepared to practice based on dental school alone.  (Mar. 13 Tr. at 143, 146-47.)  Once enrolled, dentistry residents were subject to a mandatory curriculum and prohibited from

26

practicing as a dentist for the period of their residency education at Mount Sinai.  (*See* Mar. 10 Tr. at 52; Mar. 13 Tr. at 151, 158; Ex. P7.).   Regardless of the program, residents considered their residencies at Mount Sinai to be a prerequisite to becoming practicing physicians in their chosen specialty and considered enrollment in a residency program an extension of their formal medical education.   (*See, e.g.,* Mar. 4 Tr. at 117, 227; Mar. 5 Tr. at 112, 223; Mar. 13 Tr. at 16-18).

### b.      Applications and Admission

Residents formally applied for admission to a specific residency program at Mount Sinai.  (Mar. 10 Tr. at 225; Mar. 13 Tr. at 93; Mar. 14 Tr. at 121, 127; Exs. P3, R3, V3, Y3, E4, I4, K4, N4, T4, P5; *see also* Mar. 5 Tr. at 116; Mar. 6 Tr. at 20, 136; Mar. 13 Tr. at 48.)  The criteria for application and selection, as well as the contents of the application, were controlled by the program director.  (Mar. 13 Tr. at 93; Mar 14 Tr. at 127; *see also* Mar 6 Tr. at 136; Mar. 14 Tr. at 49.)  Decisions to offer an appointment to a particular residency program were similarly controlled at the program level, although on occasion, the Director of Medical Education exercised veto power over a particular candidate.  (Mar. 14 Tr. at 127-28.)  Residents applying to any of the five ACGME-accredited residencies participated in the National Resident Match Program (approximately 79 percent of residents during the years in question).  (Mar. 14 Tr. at 128; *see also* Exs. E2, F2, G2, H2, I2, J2, K2.)  Medical students were primarily attracted to the high quality of Mount Sinai's residency programs, including their accredited status.  (*See, e.g.,* Mar 10 Tr. at 199-201; Mar. 14 Tr. at 46-47, 199; *see also* Mar. 4 Tr. at 231; Mar. 5 Tr. at 113; Mar. 13 Tr. at 19.)

Upon acceptance into a particular residency program, Mount Sinai issued the future resident an acceptance letter.  (*See, e.g.*, Mar. 4 Tr. at 126; Mar. 6 Tr. at 136.)  In

order to begin training at Mount Sinai, residents signed a "GME Program Agreement," whose contents were largely dictated by the national GME accrediting bodies, including ACGME.  (Mar. 14 Tr. at 140-42, 196-97.)  The same Program Agreement  (created by Mount Sinai's coordinator for GME) was used for all Mount Sinai residents  (Mar. 14 Tr. at 141-42.)   The residents entered into the GME Program Agreement on a yearly uniform within a particular PGY class of residents), certain benefits, and hospital policies.  The Agreement also outlined generally the resident's responsibilities.  (JPTS, Uncontested Fact No. 40; *see e.g.*, Ex. X3.)  The contents of the agreement changed when necessary   basis.[15]   The Agreement also contained the established stipend amount (which was to conform with changes in accreditation requirements.  (Mar. 14 Tr. at 142.)

Stipends paid to residents, as specified in the GME Program Agreements, were required by the various accrediting bodies, including the ACGME.  (Mar. 12 Tr. at 67-68); *see also* Ex. N14 at MS 067849 – MS 067850.   These stipends were non-negotiable; rather, they were uniformly paid to all residents based on their PGY level. The following chart summarizes the stipends paid to Mount Sinai residents during 1996-1999.

Stipends Paid to Mount Sinai Residents

| Year of Residence | Jan. 1996-June 1998 | July 1998-Nov. 1998 | Nov. 1998-Sept. 1999 | Sept. 1999-Dec. 1999 |
|---|---|---|---|---|
| PGY-1 | $28,000 | $33,000 | $33,990 | $35,010 |
| PGY-2 | $30,000 | $34,500 | $35,530 | $36,600 |
| PGY-3 | $33,000 | $36,000 | $37,080 | $38,190 |

---

[15] Although residents also filled out a standard form "Application for Employment," its usage did not establish an employment contract with "the hospital."  Rather, human resources demanded the form as a perfunctory exercise in order to register residents on the payroll.  (Mar. 14 Tr. at 118.)  No evidence exists showing that the terms of the document governed the residents' employment.  In fact, the section related to "position desired" was crossed out (Mar. 14 Tr. at 197-98; Apr. 3 Tr. at 60-61; Ex. 12; Ex. 13), and the GME Coordinator at Mount Sinai confirmed that "[h]uman resources doesn't have anything to do with the residents not being promoted or advanced to the next level of education."  (Mar. 14 Tr. at 196-97.)

| | | | |
|---|---|---|---|
| PGY-4 | $37,000 | $37,750 | $38,880 | $40,040 |
| PGY-5 | $39,000 | $39,700 | $40,970 | $42,200 |
| PGY-6 | $40,000 | $40,900 | $42,220 | $43,600 |
| PGY-7 | $42,000 | $42,840 | $44,120 | $45,440 |

(JPTS, Uncontested Fact No. 41.)  Consistent with accreditation requirements, stipend amounts paid to residents were not paid as a wage to earn a living but were intended to defray expenses for the residents so they could pursue the residency curriculum at Mount Sinai.  (*See, e.g.,* Mar. 4 Tr. at 233; Mar. 5 Tr. at 126; Mar. 6 Tr. at 141; Mar. 14 Tr. at 201; *see also* Mar. 4 Tr. at 130-31; Mar. 5 Tr. at 228; Mar. 6 Tr. at 30, 142; Mar. 13 Tr. at 155-56; Mar. 14 Tr. at 52; Ex. N14.)   Mount Sinai also provided its residents with required benefits, including health,[16] dental, life, and malpractice insurance coverage.  It also allowed them to participate in its tax-deferred retirement plan known as a 403(b) plan.  (JPTS, Uncontested Fact No. 42.)

Mount Sinai made available to its residents significant facilities and resources. Mount Sinai maintained a large, on-campus medical library, which was routinely used by residents and fellows.  (Mar. 4 Tr. at 82, 100, 163-64; Mar. 5 Tr. at 151, 254; Mar. 6 Tr. at 189; Mar. 12 Tr. at 104; Mar. 14 Tr. at 73; Apr. 3 Tr. at 90.)  Mount Sinai offered additional library resources in the specific residency programs, as well as computer facilities, laboratories, and the more traditional "classrooms" and lecture halls.  (*See, e.g*, Mar. 4 Tr. at 140; Mar. 5 Tr. at 196, 247; Apr. 3 Tr. at 90-91; Ex. N6 at 063177; Ex. K1 at MS 000609-10; Ex. Y4 at MS 038624; Ex. O1 at MS 001078-79; Ex. L5 at MS 039344; Ex. N8 at MS 000352; Ex. X1 at  MS 001526.)   Mount Sinai also provided counseling services to residents.  (Mar. 12 Tr. at 166; Ex. K1 at MS 000717-19; Ex. O1 at MS 001122-24; Apr. 3 Tr. at 71; Ex. N6 at MS 063133.)

---

[16] Residents received complimentary prescriptions for certain medications; a unique benefit at Mount Sinai.  (Mar. 14 Tr. at 157.)

### c.      Residency Program Curricula

Each residency program at issue was organized according to comprehensive, educational curricula, as dictated and approved by the pertinent accrediting body and other prevailing educational standards.  (*See, e.g.,* Mar. 10 Tr., *passim* (Testimony of Paul Katz)).  Mount Sinai also abided by the ACGME's mandate that the educational goals of the program and learning objectives of the residents must not be compromised by reliance on residents to fulfill institutional service obligations. (*See, e.g,* Mar. 10 Tr. at 85 (Dr. Katz stating that "residency and fellowship programs are educational programs . . . not programs in which the residents and fellows fulfill a primary service obligation for the institution"); *id.* at 89 (Dr. Katz stating that "the goal of these residency programs is education and not service"); Mar. 12 Tr. at 69 – 70 (Dr. Leach articulating that the purpose of the ACGME supervision guidelines was to ensure that "[t]he educational goals of the program and learning objectives of the residents must not be compromised by excessive reliance on the resident to fulfill institutional service obligations"); Mar. 13 Tr. at 64-65 (Dr. Lang stating that the Emergency Medicine Department was not "looking for service over education"; Ex. X1 at MS 001515 ("Education in combination with quality patient care will be the first priority of the emergency medicine residency program at Mount Sinai Medical Center."); Ex. L1 at MS 00851 ("the primary goal of the cardiology fellow during the three years of cardiology training must be to learn cardiology.").   Residency programs typically formalized their curriculum in a residency manual or otherwise as part of a published "core curriculum" or "teaching syllabus."  (*See* Exs. JE 3, JE5, JE7, L1, Y1, N6, O6, Y6, P7.)

Residents learned through a series of rotations, both within Mount Sinai and possibly at  an external location (such as another medical center or clinic).  (JPTS,

Uncontested Fact No. 57; Mar. 4 Tr. at 99-100, 138-40, 201; Mar. 5 Tr. at 18-27, 85, 193.)  External rotations at Mount Sinai were deemed necessary for the complete, well-rounded education of Mount Sinai's residents. (*See, e.g.*, Mar. 10 Tr. at 36-69; Mar. 12 Tr. 154-156; Mar. 13 Tr. at 78-79.)  Performing patient rounds under the supervision of an attending physician occurred in virtually all residency programs and was a critical part of the resident's education. (*See, e.g.,* Mar. 4 Tr. at 165-69; 219-21; Mar. 11 Tr. at 31-32; Mar. 12 Tr. at 117-20.)  "Grand rounds" were also held for virtually all residency programs and featured speakers on topics or cases relevant to a particular residency. (*See, e.g.,* Exs. O1, JE 3, P2; Mar. 4 Tr. at 95-96; Mar 5 Tr. at 102-03; Mar. 10 Tr. at 206; Mar. 14 Tr. at 74-76; 90; Apr. 3 Tr. at 29).  All of Mount Sinai's residency programs included regularly scheduled lectures, conferences, courses, and seminars to enhance the learning experience in the particular rotation.  (*See, e.g.*, Exs. A1, R2, U2, V2, W2, X2, Y2, A3, B3, F3, H3, I5, J5, K5; Mar. 6 Tr. at 30-31.)  Most residency programs maintained a calendar of lectures, conferences, and seminars, and had compulsory attendance, which was monitored by sign-in sheets.  (*See, e.g.*, Mar. 4 Tr. at 160, 163, 244; Mar. 5 Tr. at 38-41, 149-50, 258; Mar. 6 Tr. at  129, 154, 185; Mar. 12 Tr. at 86 , 88, 129; Mar. 14 Tr. at 70-71; Mar. 13 Tr. at 34-35, 158-9;  Apr. 3 Tr. at 79-84; Exs. T2, V4, F5, I9.)  Absences from conferences and lectures could be excused (e.g., if the resident was on another rotation or on vacation).  (*See, e.g.,* Mar 12 Tr. at 130.) Unexcused absences were tracked and residents could be subject to remediation for poor attendance.  (*See* Mar. 6 Tr. at 129, 195; *see also* Mar. 12 Tr. at 132.)

"Journal club" was typically a monthly event whereby residents would discuss topics raised by pertinent journal articles.  (*See, e.g.*, Mar. 4 Tr. at 41-42, 163; Mar. 6 Tr. at 173; Mar 10 Tr. at 225-26; Mar. 12 Tr. at 130-31, 136.)  Residents were

responsible for discussion of the articles (*see id*.) and attendance was required.  (*See, e.g.*, N8, O1, Y1, P2; Mar. 12 Tr. at 130-31; Mar. 13 Tr. at 91.)  Mount Sinai's residency programs included regularly scheduled mandatory and suggested reading assignments, both from medical textbooks, journals, and handouts.  (Mar. 5 Tr. at 103, 196; Mar. 10 Tr. at 205; Mar. 13 Tr. at 40; Apr. 3 Tr. at 78.)    Depending on the residency program, residents were either encouraged to participate in research projects or assigned to projects on a periodic basis.  (JPTS, Uncontested Fact No. 61.)

    The various residency programs administered written examinations and tests as part of the curricula.  Certain residencies included mandatory testing (an "in-service" or "in-training" exam) at the end of a given academic year.  (Mar. 10 Tr. at 211-16; Mar. 12 Tr. at 137-40; Ex. L3; Mar. 14 Tr. 156-60; Apr. 3 Tr. at 77; Ex. 65; Ex. J3.)  Some programs also provided quizzes after lectures, after assigned reading, or at the end of a rotation.  (*See, e.g.,* Exs. V2, W2, X2 and O6 at MS 063282; Mar 5 Tr. at 31-32, 153; Mar. 13 Tr. at 85-87; Apr. 3 Tr. at 26-27, 70-71.

    Residents in all of Mount Sinai's residency programs were evaluated, typically through a written evaluation consisting of numerical scores on a range of metrics, which was maintained in the resident's file.  (JPTS, Uncontested Fact No. 62;  *see, e.g.,* S3, W3, Z3, G4, L4, 04, V4, Q5, U5.)  Typically, an evaluation was completed at the end of each rotation.  (*See id.*; *see also* Mar 5 Tr. at 56, 162; Mar. 6 Tr. at 187; Mar. 10 Tr. at 49, 110-13; Mar. 12 Tr. at 140-41; Mar. 13 Tr. at 75-76.)  Residents on an external rotation remained enrolled in the residency program at Mount Sinai and were subject to evaluation and ultimate supervision provided by the program director.  (Mar. 12 Tr. at 148 (Dr. Weinberg testifying that "ensuring proper supervision" while a resident was at another institution "remains [Mount Sinai's] responsibility"); Ex. K1 at MS 000719.)

Failure to progress sufficiently in a given residency year could result in a resident repeating that residency year, or other remediation.  (JPTS, Uncontested Fact No. 63; *see also* Mar. 10 Tr. at 213-15.)

Problems regarding a resident's professional or personal behavior were addressed at the program level first, by the supervising staff physician and/or the Program Director.  (*See* Mar. 6 Tr. at 193 (Dr. Braun describing fellows being reprimanded by program attendings; Mar. 12 Tr. at 144-45 and Ex. K1 at MS 00764-65 (Dr. Weinberg explaining procedure for remediating an internal medicine resident); *See also* Mar. 10 Tr. at 214-15 (Dr. Mesko describing remediation procedure for surgical residents); Mar. 13 Tr. at 81 (Dr. Lang describing remediation procedure for emergency medicine residents).)

As required by the ACGME, residents in most, if not all, residency programs were also given the opportunity to evaluate various rotations on that particular rotation's educational contribution, instructional organization, the clinical value of the rotation, quality of the supervision, and the relevance to the resident's education and future practice of medicine.  (*See, e.g.,* Mar. 12 Tr. at 66-67; Mar. 13 Tr. at 76-77.)  Residents in certain programs also could evaluate the attending physicians, judging them on their abilities as a teacher and on the quality of their performance at clinical sessions, lectures and conferences.  (JPTS, Uncontested Fact No. 64; Ex. E6; Ex. N6 at MS 063138; Mar. 10 Tr. at 219-20; Apr. 3 Tr. at 95-96. )  Mount Sinai's Program Directors evaluated attending physicians based on their performance during rotations, the quality of their presentations and conferences, their scholarly output, and individual residents' and fellows' evaluations of attendings.  (JPTS, Uncontested Fact No. 65; Mar. 10 Tr. at 110-11, 219-20.)

### d.    Resident Supervision

The model of "progressive responsibility" is recognized throughout graduate medical education in the training and education of residents in their chosen specialty. Likewise, the educational experience for every residency program at Mount Sinai was premised on the model of progressively increasing, under supervision, the resident's responsibilities commensurate with his or her learning and experiences throughout the duration of the residency. (Mar. 10 Tr. at 157; Mar. 11 Tr. at 31-32; Mar. 12 Tr. at 120-122; Mar. 13 Tr. at 100-101.)

Importantly, residents participated fully in the care of patients during all phases of their residencies. These patients were indisputably the patients of Mount Sinai's faculty attendings. (*See* Mar. 6 Tr. at 123; Mar. 10 Tr. at 195.) All attending physicians involved in the residency programs were faculty, and their role was the supervision, education and teaching of residents. (*See, e.g.,* Mar. 10 Tr. at 201; Mar 12 Tr. at 156.) Thus, the attending physicians always supervised, either directly or indirectly, residents' program activities. (*See, e.g.,* Mar. 11 Tr. at 31-32; Mar. 12 Tr. at 93; Mar. 13 Tr. at 102-05.) Similarly patient care and treatment plans were devised in concert with an attending physician. (*See, e.g.,* Mar. 4 Tr. at 164-65, 204-05; 237-38; Mar. 13 Tr. at 161-62.) Attending physicians had to sign off on all surgical admissions and discharges. (Mar. 10 Tr. at 184.) In addition, Mount Sinai did not bill for patient care performed by residents. ((Mar. 10 Tr. at 245-46; Mar. 11 Tr. at 41-42, 82-84.) Medicare will not reimburse Mount Sinai for services performed by residents. (Mar. 11 Tr. at 41-42.)

Where a program had a "chief resident," that person was in their final year of the residency program. Though given significant responsibility pursuant to the training

model of "progressive responsibility", even senior residents serving as "chief resident" also remained subject to the supervision of the attending physicians for the duration of their chief resident year.   (Mar 3 Tr. at 254-55; Mar. 5 Tr. at 236.)    Learning to supervise and teach junior residents, as well as learning administrative skills relevant to independent practice, are part of the education process of a resident.  (Mar. 5 Tr. at 44-45, 68, 101, 139, 202; Mar. 10 Tr. at 204-05; Apr. 3 Tr. at 101.) Serving as chief resident was considered an honor.  (*See, e.g.,* Mar. 4 Tr. at 109-10; Apr. 3 Tr. at 101.)

Mount Sinai's supervision policies for the education of residents were in accordance the supervision policies mandated by the various accrediting bodies.  (*See, e.g,* Ex. R6; Mar. 4 Tr. at 166, 252; Mar. 5 Tr. at 236; Mar. 6 Tr. at 27, 140; Mar. 10 Tr. at 51, 117, 208, 221-22; Mar. 14 Tr. at 77; Apr. 3 Tr. at 40, 129-130.)

### V.     The United States' Claim for Erroneous Refund

Mount Sinai has at all relevant times withheld FICA taxes from the salaries or stipends it has paid its residents (with the exception of those residents otherwise exempt from FICA), and has also paid the employer's share of such taxes.  Mount Sinai timely filed Form 941, titled Employer's Quarterly Federal Tax Return, for each of the quarters in 1996, 1997, 1998 and 1999.   Mount Sinai reported on those forms the wages paid to medical residents as wages subject to FICA taxes, and it paid the FICA taxes shown as due.  (JPTS, Uncontested Fact No. 16.)

After paying the FICA taxes for the periods at issue, and after the decision in *Minnesota  v. Apfel*, 151 F.3d 742 (8th Cir. 1998),[17] Mount Sinai (along with numerous

---

[17].In 1998, the United States Court of Appeals for the Eighth Circuit held that stipends paid by the University of Minnesota to medical residents in 1985-86 were not subject to FICA taxation as wages paid to employees because they qualified for the Student Exception. *Minnesota v. Apfel*, 151 F.3d 742 (8th Cir. 1998). In 2003, the United States District Court for the District of Minnesota held that stipends paid by the Mayo Foundation to its medical residents from 1994 to 1996 qualified for the Student Exception. *United States v. Mayo Found. For Med. Educ. & Research*, 282 F.Supp.2d 997, 1010-19 (D. Minn. 2003)("Mayo I").

other teaching hospitals nationwide) filed with the Internal Revenue Service ("IRS") claims for refunds of those taxes.  (JPTS, Uncontested Fact No. 17.)[18]  Mount Sinai asserted that amounts paid to medical residents should have been excluded from FICA wages under the "Student Exception" in Section 210(a)(10) of the Social Security Act (42 U.S.C. § 410(a)(10)) and I.R.C. § 3121(b)(10)).  At the time of its refund claim, Mount Sinai also asserted an entitlement to the refunds on the ground that the amounts paid to residents in training were not "payment for services" within the meaning of I.R.C. § 117(c).  Mount Sinai has abandoned this latter claim.  (JPTS, Uncontested Fact No. 19.)

The IRS granted Mount Sinai's refund claims for each of 1996, 1997, 1998, and 1999.  The amounts refunded are as follows:

| Quarter Ended | Amount Refunded | Date Refunded |
|---|---|---|
| March 31, 1996 | $158,182.73 | October 9, 2000 |
| June 30, 1996 | $156,052.78 | October 9, 2000 |
| September 30, 1996 | $152,907.13 | September 18, 2000 |
| December 31, 1996 | $149,888.52 | September 18, 2000 |
| March 31, 1997 | $147,437.38 | May 7, 2001 |
| June 30, 1997 | $139,830.19 | May 7, 2001 |
| September 30, 1997 | $142,381.17 | May 7, 2001 |
| December 31, 1997 | $140,391.91 | May 7, 2001 |
| March 31, 1998 | $161,424.71 | May 14, 2001 |
| June 30, 1998 | $158,890.95 | May 14, 2001 |

---

[18] On or about April 17, 2000, Mount Sinai filed its claim for refund of the taxes attributable to amounts previously reported as wages for residents for the year 1996.  On or about March 8, 2001, Mount Sinai timely filed with the IRS claims for refund for the taxes attributable to amounts previously reported as wages for residents for the years 1997, 1998, and 1999.  Each of these refund claims involved both the employer's portion and employee's of the FICA taxes.  (JPTS, Uncontested Fact No. 18.)

| Quarter Ended | Amount Refunded | Date Refunded |
|---|---|---|
| September 30, 1998 | $156,609.18 | May 14, 2001 |
| December 31, 1998 | $155, 109.92 | May 14, 2001 |
| March 31, 1999 | $161,171.66 | May 14, 2001 |
| June 30, 1999 | $158,727.88 | May 14, 2001 |
| September 30, 1999 | $156,494.62 | May 14, 2001 |
| December 31, 1999 | $154,675.59 | May 14, 2001 |
| **Total Refunded:** | $2,450,177.32 | |

(JPTS, Uncontested Fact No. 20.)  On February 15, 2001, April 12, 2001, and February 8, 2002, before Mount Sinai had notice that the government was asserting an erroneous refund action, Mount Sinai paid to former Mount Sinai residents a total of $466,072.42 of the $2,450,177.32 refunded by the IRS.  (JPTS, Uncontested Fact No. 22.)

In September 2002, the United States filed its claim for erroneous tax refund, and thereby sought an award of $2,450,177.32, plus applicable interest.  (JPTS, Uncontested Fact No. 21.)  In order to cut off the continued exposure to post-judgment interest prior to appeal, Mount Sinai paid a "Final Judgment" (Dkt. No. 98) amount, totaling $3,036,601.15 (the refund of $2,450,177.32 plus $586,423.83 in interest).

## IV. LEGAL CONCLUSIONS AND ANALYSIS

### 1. Burden of Proof.

As the plaintiff in this erroneous refund action, the United States bears the burden of proof.  *See United States v. Commercial Nat'l Bank of Peoria*, 874 F.2d 1165, 1169 (7th Cir. 1989) (holding that the government bears the burden of proof in

erroneous refund cases); *United States v. Zeigler Coal Holding Co.*, 934 F. Supp. 2d 292, 293-94 (S.D. Ill. 1996) (providing same).  To meet its burden, the United States must prove, by a preponderance of the evidence: (1) that a refund was paid to the taxpayer; (2) the amount of the refund; (3) that the United States' action to recover the refund was timely; and (4) that the taxpayer was not entitled to the refund.  *See United States v. CSX Corp.*, No. 3-94CV773, 1995 WL 381537 at *4 (May 8, 1995, E.D. Va.) (citing *Commercial Nat'l Bank of Peoria*, 874 F.2d at 1169 and *Soltermann v. United States*, 272 F.2d 387 (9th Cir. 1959)). The first three points are not in dispute.  With only the latter point in dispute here, I now consider whether the United States has proven that Mount Sinai is <u>not</u> entitled to its FICA tax refund for years 1996 through 1999.

### 2. Eleventh Circuit Law of the Case

Any analysis must begin with guidance from the Eleventh Circuit its *Mount Sinai* decision. While the Court was addressing the legal issue of whether residents are "categorically" ineligible to assert the "student exemption," it nonetheless discussed several general principles which applied upon remand. First, it clarified that whether a medical resident is a "student" and whether he or she is employed by a "school, college, or university" are separate factual inquires that depend on the nature of the residency program in which the medical residents participate and the status of the employer. *U.S v. Mount Sinai Medical Center of Florida*, 486 F.3d at 1252. Second, it explained that the student exemption relies, in part on the identities of the employees and employer to define the scope of the exemption. <u>Id</u>. at 1253. Third, it acknowledged that "... while all interns may be students, not all hospitals are schools, colleges or universities." <u>Id</u>. Fourth, it re-emphasized that, as interpreted by the United States Department of

Treasury, Section 3121(b)(1) contemplates a case-by-case approach to determine whether particular services qualified for the student exemption (citing 26 C.F.R. §31.3121(b)(10)-2). Id. The parties stipulate that this regulation was in effect for the relevant tax years 1996-1999. The interpretation and application of this regulation is of significant importance to this case in addressing the two-part separate inquiry enunciated by the Eleventh Circuit: first, whether Mount Sinai was a "school, college, or university," and if so, second, whether the residents had the status of "students."

### 3.   Application of the § 3121(b)(10) Student Exception to Mount Sinai Residents

Treasury Regulation § 31.3121(b)(10)-2(b) provides as follows:  "The statutory tests are (1) the character of the organization in the employ of which the services are performed as a school, college, or university, . . .  and (2) the status of the employee as a student enrolled and regularly attending classes at the school, college, or university by which he is employed or with which his employer is affiliated."  26 C.F.R. § 31.3121(b)(10)-2(b) (1999).[19]   Taken in order, the "school/college/university" question focuses on the "character" of the employer of the prospective students.  See id.  An organization meets "school, college, or university" status as  that term is understood "in its commonly or generally accepted sense."  Id.  § 31.3121(b)(10)-2(d)  (emphasis added).

Next, whether the employee attains "student" status "shall be determined on the basis of the relationship of such employee with the organization for which the services are performed."  Id.  § 31.3121(b)(10)-2(c).   More specifically, "[a]n employee who performs  services in the employ of a school, college, or university,  as an incident to

---

[19] Treasury Regulation § 31.3121(b)(10)-2, including all subparts, remained unamended during the tax years in question, 1996 through 1999.  See 26 C.F.R. § 31.3121(b)(10)-2 (1999).

and for the purpose of pursuing a course of study at such school, college, or university has the status of a student in the performance of such services." *Id.* (emphasis added).

Significant too is the following defining proviso for the Student Exception: "[T]he amount of remuneration for services performed by the employee in the calendar quarter, the type of services performed by the employee, and the place where the services are performed are **immaterial**." *Id.* § 31.3121(b)(10)-2(b)(emphasis added). Thus, according to the Internal Revenue Service's own regulations, neither the amount of the resident stipends, the type of services rendered, nor the location where the services were performed may be considered as "material" in determining eligibility under the Student Exception. Notwithstanding, much of the Government's case has addressed  the "materiality" of these factors. Leaving that aside for now, I turn to the first question of whether the United States can disprove that Mount Sinai's residents were "in the employ" of a "school, college, or university."

A.     **"In the Employ of … a School, College, or University"**

There are two pertinent inquires  when considering whether Mount Sinai's residents for the 1996 through 1999 tax years were "in the employ of a school, college, or university."  The first inquiry  focuses on the identity of  the organization that employed the residents.  Then, the second inquiry addresses whether that organization was a "school, college, or university." Each inquiry is discussed separately below.[20]

---

[20].  The United States argues that "Mount Sinai fails to focus on the two precise issues before the Court: are residents 'students'  and is Mount Sinai a 'school?'" (DE 201, page 1). The United States concedes that "residents are learning," but denies that Mount Sinai has demonstrated any meaningful distinction between the training that its residents acquire and any other sought of on-the-job training, or between the situation of residents and that of other people who work at a relatively low-paying and relatively temporary job while they learn things they will put to use later in their professional lives (DE 201, pages 1-2). For reasons set forth in this Opinion, I disagree with the United State's characterization that Mt. Sinai's evidence fails to distinguish between "education" and "learning," on the one hand, and the "student" and "school" issues, on the other hand. In any event, the burden was not on Mt. Sinai, but on the United States, to disprove that Mt. Sinai was a "school, college, or university," and that Mt. Sinai's residents were "students."

### 1.    The Residents' Employer

In this case, there is no dispute as to the residents' employer.   Mount Sinai is a fully integrated non-profit medical center, and the United States has presented no evidence to suggest that a separate, legally cognizable entity employs its residents.  *Cf. Mayo I*, 282 F. Supp. 2d at 1011 (where the sub-entity, Mayo Foundation, was the residents' employer for FICA purposes).  The record is replete with evidence supporting not only how Mount Sinai's residency programs were operated like a "school, college, or university" but also how the medical center as a whole qualified as a "school, college, or university."

### 2.    The Employer's Status as a "School, College, or University"

#### a.    Applicable definitions

The statutory test governing the "school, college, or university" inquiry emphasizes the   "character of the organization."   26 C.F.R. § 31.3121(b)(10)-2(b). Once more, the implementing regulations provide the relevant starting point:  "The term 'school, college, or university' within the meaning of this exception is to be taken in its commonly or generally accepted sense."  26 C.F.R. § 31.3121(b)(10)-2(d).  Consistent with this approach, this Court has held that "commonly and generally accepted" definitions are those found in the dictionary.  *See United States v. Greenpeace Inc.*, 314 F. Supp. 2d 1252, 1257 (S.D. Fla. 2004) (stating that "[w]ords in a statute are to be given their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import" and "it is an accepted practice for courts to look to dictionaries for definitions") (internal quotation marks omitted).

Likewise,  the *Mayo I* court used Webster's Dictionary definitions of each term, *id.*, 282 F. Supp. 2d at 1013. For the same reasons stated in *Mayo I*, I conclude that the

same dictionary definitions apply here.  As in *Mayo I*, a "school" in its commonly and generally accepted sense is "[a]n establishment for teaching a particular skill or group of skills."  *Id.* (quoting Webster's Third  New Int'l Dictionary (1993)).  A "college" in its commonly and generally accepted sense is "[a]n institution offering instruction [usually] in a professional, vocational, or technical field."  *Id.*  Finally, a "university" in its commonly and generally accepted sense is "[a]n institution of higher learning providing facilities for teaching and research and authorized to grant academic degrees."  *Id.*

In adopting the dictionary formulations of "school," "college," and "university," I reject as counterintuitive and unpersuasive the United States' argument that the commonly and generally accepted sense of each word can be drawn from other provisions of the Internal Revenue Code.  The *Mayo I* court, in considering the same argument, came to the same conclusion as I reach here:

> The legal premise supporting the government's analysis -- namely, that the most logical place to look for the "commonly and  generally accepted sense" of a term is the Internal Revenue Code -- is both counterintuitive and inconsistent with the plain meaning of the exclusion's implementing regulation.  If the Internal Revenue Service had intended the term "school, college, or university" in § 3121(b)(10) to have the same scope and meaning as "educational institution" (found in 26 U.S.C. § 170(b)(1)(A)(ii)) or "educational organization" (found in 26 U.S.C. § 151(c)(4)(A)), it could have clearly and explicitly given the phrase such a scope and meaning  by cross-referencing those Code provisions and their implementing regulations.  The Service did not do so, opting instead for a simple and straightforward statement that the term "school, college, or university" should be taken in its commonly and generally  accepted sense.  The Court concludes that a "primary purpose" standard is not the relevant test.  *Mayo I*, 282 F. Supp. 2d at 1013.[21]

---

[21] The United States asserted as a contested issue of fact in the parties' Joint Pretrial Statement that "Mount Sinai does not have as its primary purpose the education of medical residents."  (JPTS, Pl.'s Contested Fact No. 2.)  The United State's advocates the "primary purpose" test applied elsewhere in the Internal Revenue Code (e.g. to determine whether an entity is an educational institution, which test, as applied to the Student Exemption, was specifically rejected in *Mayo I*, 282 F.Supp.2d at 1013. The United State's arguments, which failed in *Mayo I*, fares no better here. While the United State's argues that *Mayo*

Accordingly, I adopt *Mayo's I's* analysis and reasoning as persuasive here.

### b. United States' Evidence and Arguments on "School, College, or University" Is Unpersuasive

The United States relies on several different arguments in asserting that Mount Sinai cannot be a "school, college, or university." First, it points to certain record evidence that Mount Sinai did not identify itself using those terms. While there is evidence which supports the United State's position, other evidence shows that Mount Sinai did, at times, identify itself using the word "school." (*See, e.g.*, Ex. A4 (U.S. Department of Education "In-School Deferment Request" where Mount Sinai is

---

*I's* definition of a "school" is so broad as to render the term meaningless, it nonetheless reflects the standard in the Treasury Department's regulations. 26 C.F.R. §31.312(b)(1)-(2)(d). I concur with *Mayo I* that if the IRS intended that any of the terms "school, college, or university" take on a meaning other than their "commonly and generally accepted sense, it would have and should have said so. *Mayo I*, 282 F.Supp.2d at 1013. Moreover, application of a test involving a wholly different tax exemption (and from a different section of the Internal Revenue Code) is both counterintuitive and inconsistent with the plain meaning of the exclusion's implementing regulation." *Id.* Finally, the "primary purpose" test comes from the 2005 amended Treasury Regulations which, as the United States admits, is wholly *prospective* in effect, and apply only to services performed after April 1, 2005. I note that *Mayo II* found the entire amended regulation invalid, including the "primary function" test. *Mayo II, 503 F.Supp.2d at 1171-74 (D.Minn. 2007)*/ Thus, because "primary purpose" is not the accepted legal standard, I find irrelevant any evidence presented by the United States toward that showing.

Even if the "primary purpose" test applied to the "school, college, or university" issue, the United States has not shown (as is its burden to do) that Mount Sinai does *not* satisfy the test. Mount Sinai is a 501(c)(3) non-profit institution, with its primary tax-exempt purpose stated, in pertinent part, as follows: "Mount Sinai Medical Center, an internationally recognized not-for-profit, academic medical center, is committed to providing exceptional health care enhanced through teaching and research." (Exs. 1 & 2; Ex. K6; Mar. 10 Tr. at 11-13.) *Cf. Mayo I,* 282 F. Supp. 2d at 1013 n.30. Under Mount Sinai's Articles of Incorporation, it was organized and operated "exclusively for charitable, scientific, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code." (Ex. JE1 (including express purpose "to conduct educational activities in the health sciences")). Mount Sinai is one of only six statutory teaching hospitals in the State of Florida (Mar. 10 Tr. at 10; Apr. 3 Tr. at 137-38), which fact is reinforced by its mission statement: "Our mission is to provide quality health care enhanced through education, research, teaching and volunteer services." (Ex. B1.) The totality of the evidence confirms, in fact, that a substantial part of Mount Sinai's mission was and is the education of medical residents, and that the institution and its faculty are universally committed to that mission. (*See, e.g.*, Mar. 10 Tr. at 13-17, 22, 198-193, 201-202; Mar. 12 Tr. at 93-95; Mar. 13 Tr. at 57-58; Apr. 3 Tr. at 138-39.) Finally, as discussed further, *infra*, in the operation of its graduate medical education, Mount Sinai spends more on medical education and research than it receives from patient care. (Apr. 3 Tr. at 149-153.)

I further note that the *Mayo I* court found that an organization "primary purpose" could be that of a "school, college, or university" and yet have "clinical care" as its "largest activity." *Id.*, 282 F. Supp. 2d at 1013 n.30 & 1014. As that court found, and I echo *infra*, "the principal classroom for residents must be the clinical setting because patient care in a medical specialty is what residents are receiving training for." *Id.* at 1015. Indeed, "it is impossible to separate 'education' from 'patient care.'" *Id.*

identified as the "school" and the Director of Medical Education signed as authorized school official for resident enrolled in 1999 and seeking loan deferment)). Regardless of the nature or quality of the evidence on this point, I  do not conclude that the use, or lack of use, of the words themselves is compelling.  As I will explain, a more significant factor is whether Mount Sinai's residency programs were organized and operated as a school, college or university in the common or generally accepted sense. This is a "functionality" driven test, rather than mere labeling based on nomenclature.

Second, along the same lines, the United States next argues  that only "undergraduate medical students'"  attend "medical school," and that the use of the word "school" is limited to that context.  (JPTS, Uncontested Fact No. 12.)  Again, the use of a "label" is not determinative in the residency context.  For that matter, both "medical school" and "residency" education carry the labels of "medical education" – one undergraduate and one graduate.  It likewise is undisputed that exposure to clinical rotations at a hospital or clinic begins in earnest not at the advent of one's residency or intern year but during the third year of undergraduate medical school, and then continues throughout the fourth year.  (Mar. 3 Tr. at 59; Mar. 11 Tr. at 115-17.)  In that sense, the educational template varies little from the third and fourth year of medical school to one's PGY-1 year.  As Dr. Jordan J. Cohen, one of Mount Sinai's expert witnesses,  testified:  "I view the bedside as the predominant classroom for a resident and for a third and fourth year medical student for that matter as well.  That is where the learning is occurring."   (Mar. 11 Tr. at 121 (emphasis added).)  Accordingly,  to rely on whether Mount Sinai consistently called itself a "school" (or "college" or "university"), or whether only "medical students" are called "students"  would elevate semantics over the substantive inquiry in the Student Exception.

Second, the United States contends that Mount Sinai's school, college, or university status is undercut because the medical center Sinai does not grant formal "academic degrees." (Apr. 3 Tr. at 181.)  This carries little weight here.  A degree is not mandatory to achieve "school, college, or university" status.  See Mayo I, 282 F. Supp. 2d at 1016 (analyzing the student prong of the Student Exception test and holding that "[t]aking the term 'school, college, or university' in its commonly and generally excepted sense, the Court concludes that a 'course of study' at a 'school, college, or university' might not -- and need not -- lead to a degree").

While it is true that residents do not receive an academic degree as such, it is significant that all Mount Sinai residents and fellows receive a "certificate of completion," which signifies the successful completion of the graduate medication education program at Mount Sinai in their specialty or subspecialty.  (See, e.g., Mar. 4 Tr. at 148; Mar. 5 Tr. at 263; Mar. 6 Tr. at 194; Mar. 10 Tr. at 219; Mar. 14 Tr. at 83). Those certificates were handed out at a yearly "graduation ceremony" (See, e.g., Mar. 10 Tr. at 114-15; Mar. 14 Tr. at 171-73). A "certificate of completion" is comparable to an academic degree in the sense that it  carries great significance for the residents. For all residency programs, only after <u>completion</u> of the particular residency program is one accorded board eligibility in his or her specialty or subspecialty.[22]   In turn, board eligibility is key to being eligible to receiving hospital admission privileges in the area of specialty or subspecialty.

---

[22] Though not mandatory to practice as a dentist, one could not practice in a subspecialty of dentistry without first completing a "general practice residency," as was offered by Mount Sinai.  (Mar. 13 Tr. at 146.)  Mount Sinai's evidence showed that the ADA-accredited residency program in dentistry was considered prestigious and was pursued because dental school graduates felt unprepared to practice dentistry without more training.  (Mar. 13 Tr. at 143, 146-47.)  The lone dental resident to testify at trial stated that he hung on his office wall his Mount Sinai dental residency certificate of completion.  (Mar. 13 Tr. at 147.)  As with all other residency programs at Mount Sinai, while enrolled in the training program, the dental resident was not permitted to practice as a dentist but instead had to participate in the program curriculum.  (Mar. 10 Tr. at 186; Mar. 13 Tr. at 151.)

The United States' third basis for argument challenging the school, college, or university status of Mount Sinai concerns the alleged "profitable" nature of residency programs. The United States presented the expert testimony of an economist, Dr. Sean Nicholson, who opined that teaching hospitals earn "substantial revenues" on their residency programs and that residents are compensated for performing patient care. (Mar. 6 Tr. at 12, 66, 69-70.) Dr. Nicholson further opined that Mount Sinai realized substantial profits during the 1996 through 1999 time frame from federal reimbursement payments. (*Id.* at 50-56; 60-66.) He identified Medicare reimbursement, received in the form of direct and indirect GME payments ("DGME" and "IME" payments, respectively) as revenue to Mount Sinai. (*Id.*) According to Dr. Nicholson, IME payments received by MSMC, in particular, were all "profits" to Mount Sinai.

Upon review, I give little weight to Dr. Nicholson's opinions. I find them to be speculative and thus unreliable. Certain of Dr. Nicholson's opinions are entirely bereft of factual support. For example, Nicholson admittedly had not reviewed Mount Sinai's financial statements for the 1996 through 1999 time frame. (Mar. 6 Tr. at 83.) As a result, his opinions on Mt. Sinai's profitability lack any basis in the <u>actual costs</u> incurred by Mount Sinai in running the medical center, let alone its residency programs.[23] (Mar. 6 Tr. at 83.) Similarly, Dr. Nicholson opined that Mount Sinai's residents were performing "patient care," but he performed no analysis (nor relied on any) chronicling what the residents actually did, and his opinions are outside his expertise as an economist. Moreover, Dr. Nicholson's opinion on resident "value" to a hospital relied on

---

[23] I find more credible the testimony of Mount Sinai's rebuttal expert, John Wills, who stated that a profit calculation requires the consideration of actual costs or expenses incurred. (Mar. 14 Tr. at 17-18.) Here, Dr. Nicholson relied on no such calculations in reaching his conclusions regarding Mount Sinai's residency programs.

four studies containing either inconsistent sample sizes, inconsistent locations of samples, or erroneous comparisons.[24]  (Mar. 6 Tr. at 87-91.)  Several of his opinions relied on a MEDPAC study, even though the study's findings were rejected by Congress.  (Mar. 6 Tr. at 96.)  Dr. Nicholson further relied on an economic theory (Dr. Becker's "Theory of Human Capital") that does not apply to non-profit institutions.  (Mar. 6 Tr. at 83.) Finally, it is also important to note that Medicare, as an agency of the United States,  has recognized the need to supplement payments to teaching hospitals in order to foster graduate medical education. Without such supplements, it is a fair inference, contrary to Dr. Nicholson's opinions, that teaching hospitals would operate at even greater losses.

Here, the  record evidence does not support that Mount Sinai's residency program was a profitable business.  It is undisputed that Mount Sinai could provide patient care far more cost-efficiently <u>without</u>  residents because of the time and effort required to supervise and teach them.  (Mar. 10 Tr. at 220-21; Mar. 11 Tr. at 10-11, 55-56; Mar. 12 Tr. at 119; Mar. 13 Tr. at 65; Apr. 3 Tr. at 149–53; *see also* Mar. 11 Tr. at 130); *Mayo I*, 282 F. Supp. 2d at 1014.   According to financial statements in evidence and the testimony of its chief financial officer, Alex Mendez, Mount Sinai operated at a loss in the aggregate during the years at issue (mitigated by virtue of a transfer from Mount Sinai's charitable foundation to the hospital, totaling $17 million during those years). (Apr. 3 Tr. at 141-42.)  No evidence exists to support a conclusion that the residency programs somehow generated a profit during that time.   In fact, according to Mr. Mendez, that result would contradict his observations from the marketplace – as a matter of course, for-profit hospitals do <u>not</u> offer residency programs.  (Apr. 3 Tr. at

---

[24] Even the "value" of a resident calculation was incorrect in Dr. Nicholson's report.  (Mar. 6 Tr. at 87.)

153-56; *see also* Mar. 11 Tr. at 130 (Dr. Cohen testifying that a "minority of hospitals in this country are involved in residency training").)

Further undercutting Dr. Nicholson's profit theory, Mr. Mendez identified additional costs associated with Mount Sinai's residency program, none of which are included in any payments or reimbursement Mount Sinai receives: (1) increased costs due to increased patient acuity and lengths of stay at teaching hospitals; (2) increased costs necessary to purchase better, state of the art equipment; (3) increased costs due to hiring the best and the brightest teachers in the particular medical field; (4) increased infrastructure costs to accommodate the residency program; and (5) an inability to outsource certain services due to the necessity to maintain a qualified attending staff (*e.g.*, radiology services).  (Apr. 3 Tr. at 149-52.)  For all of these reasons, I find credible Mount Sinai's claim that it spent more on a net basis on clinical education during the years in question than it received from patient care.  (Apr. 3 Tr. at 156-57);  *Mayo I*, 282 F. Supp. 2d at 1014.[25]  Accordingly, I conclude that the United States' argument on the profitability of the residency program at Mount Sinai lacks persuasive merit.

### c.    Mount Sinai's Evidence and Arguments on "School, College, or University" Status are Convincing

The United States also strongly contests this prong of the Student Exception test based on residents' participation in patient care. Essentially, the argument is that Mount Sinai has a resident program to make money, not primarily to educate doctors who have already graduated from medical school. In many ways, the argument relies on the

---

[25] United States counsel argued at closing "[w]e don't know what the revenue from patient care is.  We do have … Mr. Mendez's testimony that overall it lost money, but we don't have any breakdown as to whether that is from patient care or what."  (Apr. 3 Tr. at 196.)  Mr. Mendez's testimony, as presented by Mount Sinai, stands unrebutted.  To the extent the United States relies on a profit analysis, it had to discount it by Mount Sinai's costs  to provide quality health care.

"primary purpose" standard which is not what governs here. See discussion at footnote 21 above. But, even if it did, I would reach the same result.

Turning back to the educational focus at Mount Sinai, I note that the broader focus of Mount Sinai is  reflected in its mission statement at the time:  "Our mission is to provide quality health care enhanced through education, research, teaching and volunteer services." (Ex. B1.)  The greater weight of the evidence supports that Mount Sinai has upheld its mission through the tax years in question.  Mount Sinai was (and remains to this day) one of only six statutory teaching hospitals in the state of Florida, as determined by its accreditation status and size of program.  (Mar. 10 Tr. at 10; Apr. 3 Tr. at 137-38); see Fla. Stat. § 408.07 (2008).  A separate "Department of Medical Education" was established, with a full-time Director of Medical Education.  (JPTS, Uncontested Fact No. 53; Mar. 10 Tr. at 66; Mar. 14 Tr. at 102.)  Subsumed within the Department of Medical Education at Mount Sinai were three levels of education: undergraduate, graduate, and continuing medical education levels.  (JPTS, Uncontested Fact No. 53; Mar. 14 Tr. at 102.)  A coordinator for each of the three educational levels reported to the Director of Medical Education.  (JPTS, Uncontested Fact No. 53; Mar. 14 Tr. at 102; Mar. 10 Tr. at 13-14.)

Mount Sinai maintained affiliation agreements with various educational institutions (including Nova Southeastern University and the University of Miami) that permitted undergraduate medical students to rotate into Mount Sinai and be taught by Mount Sinai's attending physicians.  (Exs. 4-7.)  Affiliation agreements were likewise maintained at the GME level so that other residency programs could rotate their residents through services at Mount Sinai.  (Exs. D1 and E1.)  Similarly, as part of the mandatory curriculum in a given specialty or subspecialty, Mount Sinai maintained

affiliation agreements that enabled its own residents to rotate through services at other hospitals.  (Exs. C1, F1, G1, H1, I1, J1.)  As an oversight mechanism, the Department of Medical Education established a Medical Education Committee ("MEC"), which met at least six times each year.  (JPTS, Uncontested Issue of Fact No. 53; *see also* Ex. M6; Mar. 12 Tr. at 169-70.)

In furtherance of its research mission, Mount Sinai was the only hospital in Florida at the time with a Cyclotron facility, enabling the center to conduct research in the field of Nuclear Medicine.  Other research areas included:  Magnetic Resonance Imaging and Computer Tomography Ultrasonography.  Physicians at Mount Sinai conduct research in a variety of areas, including AIDS, breast disease, electrophysiology, dermatological disorders, monoclonal antibodies, pacemakers, pain management, pulmonary medicine, and sleep disorders.  (JPTS, Uncontested Fact No. 8.)

The genesis for all residents' patient care experiences at Mount Sinai is the residency programs' individualized curricula.  (*See* Mar. 10 Tr. at 34-35, 41-42, 44-45, 52-57, 61-62, 64-66; Mar 11 Tr. 31-32, 121; *see, e.g.*, Exs. JE3, JE5, JE7, L1, N6, O6, Y6, Y1, P7 and K7.)  As an example, the ACGME employs the concept of "meaningful patient responsibility" to ensure a sufficient level and degree of patient interaction in teaching the full scope of a particular medical specialty.  (Mar. 12 Tr. at 46-47; *see also* Mar. 11 Tr. at 129.)  In any case, education is the central focus of the residents' experience.[26]  (*See, e.g,* Mar. 10 Tr. at 85 (Dr. Katz stating that "residency and

---

[26] As Dr. Jordan J. Cohen testified, other factors beyond the adoption of more rigorous academic curricula are at work here.  The increasing complexity of procedures, sicker patients, shorter stays, and lower duty hours all combine to impose on residents greater educational demands than experienced in the past. (Mar. 11 Tr. at 152-53.)  This evolution in medicine has been directly addressed by the ACGME.  As Dr. Leach testified, the ACGME has mandated that sponsoring institutions "must not place excessive reliance on residents to meet the service needs of the participating training sites, and to this end, the sponsoring and participating institutions have to have institutional written policies or procedures.  For example, the hospital must have an intravenous phlebotomy messenger transporter service so residents aren't

fellowship programs are educational programs . . . not programs in which the residents and fellows fulfill a primary service obligation for the institution"); *Id.* at 89 (Dr. Katz stating that "the goal of these residency programs is education and not service"); Mar. 12 Tr. at 69–70 (Dr. Leach articulating that the purpose of the ACGME supervision guidelines is to ensure that "[t]he educational goals of the program and learning objectives of the residents must not be compromised by excessive reliance on [the] resident to fulfill institutional service obligations"); Mar. 13 Tr. at 64-65 (Dr. Lang stating that the Emergency Medicine Department was not "looking for service over education"; Ex. X1 at MS 001515 ("Education in combination with quality patient care will be the first priority of the emergency medicine residency program at Mount Sinai Medical Center."); Ex. L1 at MS 000851 ("the primary goal of the cardiology fellow during the three years of cardiology training must be to learn cardiology").)

Patient care is integral and critical to a resident's education.  The *Mayo I* court reached the same conclusion:

> The quality of a graduate medical education program depends directly on the breadth and quality of patient care pursued at the clinical institutions.  Put another way, a substantial and diverse patient base, together with the pursuit of high quality care by staff physicians and other members of the patient care team, is  necessary for providing appropriate training to residents.  "Actual care in the service of patients is inherent in the educational process. It really cannot be separated from that.  Playing just an observational role in this is not the same as actually being involved directly in  patient care."  Because the objective of residencyprograms is ultimately to make physicians capable of caring for patients twenty-four hours a day and seven days a week, it is impossible to separate "education" from "patient care."  Thus, the principal classroom for residents

---

consumed in doing that."  (March 12 Tr. at 41); *see Mayo I*, 282 F. Supp. 2d at 1015 (finding "significant" that the Mayo Foundation ensured that allied healthcare personnel performed ancillary procedures that have no "educational value").

must be the clinical setting because patient care in a
medical specialty is what residents are receiving training for.

*Id.*, 282 F. Supp. 2d at 1014-15 (internal citations omitted).[27]  Because the evidence of

record compels the same conclusions here, I adopt and follow the conclusions  from

*Mayo I.*[28]

Residents come to Mount Sinai for training in a medical specialty or subspecialty,

and direct (and indirect) patient care is an intrinsic and mandatory component of that

training.  The teaching that occurs at the patient bedside, in the clinical environment, is

"the key learning environment for residents."  (Mar. 11 Tr. at 63-64, 120-21; *see also*

Mar. 11 Tr. at 133 (Dr. Cohen stating that the "education of the resident at a patient's

bedside is absolutely critical").)  As Dr. Cohen opined, and I so find:

> [T]he proper classroom environment for residency training is,
> in fact, the patient's bedside or the clinic setting where the
> patients are.  That is the ultimate purpose of residency
> education is to insure that residents have sufficient
> experience with the actual care of patients so that they can
> be judged competent to carry on those activities in an
> independent way. . . .  The education of the resident at a
> patient's bedside is absolutely critical.  It's the core to the
> preparation and education of physicians for independent
> practice.  It can't be otherwise.[29]

---

[27] A clear implication in the residency context is that participation in clinical patient care, in and of itself, <u>does not</u> disqualify an organization from "school, college, or university" status.  This result is equally compelled by the implementing regulation as well.  *See* 26 C.F.R. § 31.3121(b)(10)-2(b) (providing that the "location" of services cannot be material to the Student Exception inquiry).

[28] Confusingly, the United States stated in closing that it agrees with *Mayo I* that education cannot be separated from patient care, even while arguing for a delineation between the two.  (Apr. 3 Tr. at 196.)

[29]  In Dr. Cohen's opinion, patient care is such a critical part of a resident's education that he can't imagine how society would tolerate a system in which physicians were allowed to enter the practice of medicine without having gone through an intense period of scrutinized patient care activities sufficient to judge them, that judgment being rendered by experienced clinicians and faculty members, sufficient to judge them competent to carry on those activities independently. … The only way to assume that competence is if they have engaged in those activities under supervision to the point where they can be judged to be independently competent.
(Mar. 11 Tr. at 133-34.)

(Mar, 11 Tr, at 133.)   Hands-on, direct patient care offers residents something they cannot experience by "simply looking at a video or hearing a lecture."  (Mar. 11 Tr. at 125.)  *Mayo I*,  282 F. Supp. 2d at 1014-15.  Thus, for the doctor-in-training, watching or participating in an  actual operation, for example, as opposed to being lectured to in a traditional lecture hall or classroom, is the "more appropriate classroom" for a variety of reasons.  (Mar. 11 Tr. at 63-64, 125.)   The testimony of record bore out such opinions. Not only did former Mount Sinai   residents universally testify that their residency was an educational experience, but also, they believed their experience with hands-on patient care was the most important part of that  education.  (*See, e.g.*,  Mar 4 Tr. at 188 (Dr. Mora explaining that the "only way to definitely     treat patients is treating patients.  The only way to learn about treating patients is treating real patients."); Mar. 5 Tr. at 43 (Dr. Robertson testifying that "[p]atient care is what physicians do.   In order to become proficient in patient care you need to be exposed to as many different types of patients with different presenting complaints and illnesses in order to be good at taking care of ill patients.").)

At the same time, Mount Sinai established that "typical" school facilities and resources largely existed  at Mount Sinai.  Mount Sinai maintained a large, on-campus medical   library, which residents testified they used routinely.  (Mar. 4 Tr. at 82, 100, 163-64; Mar. 5 Tr.    at 151, 254; Mar. 6 Tr. at 189; Mar. 12 Tr. at 104; Mar. 14 Tr. at 73; Apr. 3 Tr. at 90.)   Mount Sinai also offered additional library resources in the specific residency programs, as well as computer facilities, laboratories, and the more traditional "classrooms" and lecture halls.  (*See,  e.g*, Mar. 4 Tr. at 140 (residents made use of the emergency department's library); Mar. 5 Tr. at 196 (pathology department library containing  books or articles of interest); *id.* at 247 (describing dedicated computer

teaching program for pathology residents); Apr. 3 Tr. at 90-91 and Ex. N6 at 063177 (discussing radiology teaching file library); Ex. K1 at MS 000609-10; Ex. Y4 at MS 038624; Ex. O1 at MS 001078–79; Ex. L5 at MS 039344; Ex. N8 at MS 000352; Ex. X1 at  MS 001526); *Cf. Mayo I*, 282 F. Supp. 2d at 1001.  Mount Sinai also made counseling services available to its residents.[30]  (Mar. 12 Tr. at 166; Ex. K1 at MS 000717-19; Ex. O1 at MS 001122-24;  Apr. 3 Tr. at 71; Ex. N6 at MS 063133.); *Mayo I*, 282 F. Supp. 2d at 1001.[31]

Based on the foregoing, I conclude that Mount Sinai is a "school" according how that term is used "in its commonly or generally accepted sense."  26 C.F.R. § 31.3121(b)(10)-2(d) (emphasis added); *see also Mayo I*, 282 F. Supp. 2d at 1013 (A "school" in its commonly and generally accepted sense is "[a]n establishment for teaching a particular skill or group of skills.").

**B.        Were Mount Sinai's Residents "Students"?**

Turning to the final inquiry under the Student Exception test, the question is whether the United States has carried its burden by proving that although in the employ of a school, Mount Sinai's residents were not "students."[32]  I earlier mentioned that  the statutory test for student status is whether the individual was "enrolled and regularly

---

[30] Professional counseling services were among the services mandated by the ACGME and incorporated into the resident's contract.  (Mar. 12 Tr. at 68-69.)

[31]  .  Mount Sinai also presented other, compelling,  expert testimony on the "school" inquiry.  Dr. Mary M. Cooke opined that residency programs generally have all the key features of a school:  Each has a planned, progressive curriculum; groups of residents move through the curriculum together; formal assessments are conducted of resident's progress; there is a mixture of didactic and experiential learning opportunities; there are teachers (in this instance, attending physicians) who are drawn to the programs because they like to teach; there are educational administrators involved in the programs; and the residency programs are evaluated on how well their residents perform, and how successful their residents are after the completion of their residency.  (March 11 Tr. at 53-56.)  Mount Sinai proved to have each of the above-noted features.  (*See, e.g.,* Mar. 10 Tr. at 34-35, 41-42, 44-45, 52-57, 61-62, 64-66, 201; Exs. JE3, JE5, JE7, L1, N6, O6, Y6, Y1, P7, K7; *see generally* Exs., K1, Y4, O1, L5, N8, X1, C7.)

[32] While the United States has argued that the employer for purposes of the "school, college, or university" inquiry must be the entire medical center, there is no question that the persons subject to the "student" inquiry are the residents for whom the United States originally granted the FICA refund.

attending classes at the school, college, or university by which he is employed or with which his employer is affiliated."  26 C.F.R. § 31.3121(b)(10)-2(b).  The implementing regulation further provides as follows:

> The status of the employee as a student performing the services shall be determined on the basis of the relationship of such employee with the organization for which the services are performed. An employee who performs services in the employ of a school, college, or university, as an incident to and for the purpose of pursuing a course of study at such school, college, or university has the status of a student in the performance of such services.

*Id.*, § 31.3121(b)(10)-2(c).  In short, the focus must be on the relationship between the resident and Mount Sinai, with particular attention to  whether the "services" performed by the resident are "incident to and for the purpose of pursuing a course of study."

In this regard, I find guidance from the Eighth Circuit's analysis in *Minnesota v. Apfel*, 151 F.3d 742 (8th Cir. 1998).  *See Mayo I*, 282 F. Supp. 2d at 1015.  Consistent with the inquiry in that case, I will address,  as part of the "student" inquiry, "whether the residents' relationship with the organization was primarily for educational purposes or primarily to earn a living." [33]   *Id*.  I also will examine under  the aforementioned regulations –  (1) whether Mount Sinai's residents were enrolled and regularly attending classes, (2) whether the residents' relationship with Mount Sinai was primarily for educational purposes or primarily to earn a living, and (3) whether the services performed by residents were "incident to and for the purpose of pursuing a course of study."  *Mayo I*, 282 F. Supp. 2d at 1015-18.

---

[33]As the *Mayo I* court noted, the Social Security Act's general student exclusion at issue in *Apfel*, 42 U.S.C. § 410(a)(10), has language identical to that of FICA's Student Exception,  26 U.S.C. § 3121(b)(10). *Mayo I*, 282 F. Supp. 2d at 1009.  The *Mayo I* court further found that "[s]ubsection (c) [of Treasury regulation § 3121(b)(10)-2] is comparable to the implementing regulation the Eighth Circuit considered in Apfel," both focusing on the relationship of the employee to the organization.  *Id.* at 1015.

### 1.    "Enrolled and Regularly Attending Classes"[34]

Concerning enrollment first, the application and admission process for the years in question closely resembled that of a traditional school, college, or university. Admission to each and every residency program was based on merit, taking into account the applicant's personal background, educational achievement in undergraduate school, training, letters of recommendation, and interviews.  (*See, e.g.*, Mar. 10 Tr. at 222-24; Mar. 12 Tr. at 171; Mar. 13 Tr. at 93-94; Mar. 14 Tr. at 127 (Murphy)); *Mayo I*, 282 F. Supp. 3d at 1016.   Upon acceptance into a program, a resident was issued an acceptance letter.  (*See, e.g.*, Mar. 4 Tr. at 126; Mar. 6 Tr. at 136); *Mayo I*, 282 F. Supp. 3d at 1016.  Thereafter, Mount Sinai issued each resident a GME Program Agreement to complete and sign.  (Mar. 14 Tr. at 139-144.)  Signing of the initial Agreement represented that resident's "enrollment."   (Mar. 14 Tr. at 144.) Furthermore, the evidence of record confirmed that Mount Sinai's Department of Medical Education (Ex. W4; Ex. X3 at MS 011286;[35] EX. M1 at MS 000978), the residents themselves (*see, e.g.,* Mar. 6 Tr. at 234; Mar. 13 Tr. at 147; Exs. B4 & C4), and the educational community at large (Ex. A4; Ex. J4; Ex. L6 at  MS 060971; Ex. P6) all endorsed the concept of "enrollment" with respect to GME at Mount Sinai.  For these reasons, I conclude that residents were "enrolled" in their respective residency programs.

---

[34] . I conclude that the United States misreads the statute in arguing that residents should have been "enrolled in "classes." On its face, the Student Exemption requires that one must simply be "enrolled" at "such school, college or university." The requirement with respect to classes is simply that one "regularly attends." 26 U.S.C. § 3121(b)(10).

[35] Exhibit X3 included the previously referenced 1999 GME Program Agreement of a breast imaging fellow.  The Court notes that among the provisions therein was a covenant by Mount Sinai to assist a resident in "enrolling" in another ACGME residency program if necessitated by residency reduction or program closure at Mount Sinai.  (Ex. X3.)

The United States next contends that residents do not regularly attend classes. But the term "classes" in a medical educational context is different from the traditional "lecture only" environment common to undergraduate schools. After the second year of medical school, medical students learn by observing what actually goes on in teaching hospitals. The same is true with residents, but with even more "hands on" participation. This is not to say that residents do not attend lecture-type classes. But the important point is that the  actual teaching most often occurs where the patients are situated. For instance, observing and assisting in an actual surgery with the attending surgeon has more educational value than merely seeing a video in a classroom about the same surgery. The operating room becomes the classroom.

In any event, across all twelve residency programs at Mount Sinai,  participation in the program curriculum was <u>mandatory</u> during the tax years in question.  (*See, e.g.,* Mar. 4 Tr. at 5, 158; Mar. 5 Tr. at 27; Mar. 10 Tr. at 206; Mar. 14 Tr. at 71, 76; Apr. 3 Tr. at 79.)  Although residents did not register for credit hours, the respective program directors specified the subject matter areas to be covered through a schedule of mandatory rotations.  (Exs. JE3, JE5, JE6, JE7, N6, 06, Y6, Y1, P7); *see Mayo I*, 282 F. Supp. 2d at 1016-17 (rejecting the argument that registration for credit hours was required to find regular class attendance).  If a resident transferred into Mount Sinai, that resident's course of study to date was assessed and any deficits were addressed. (Mar. 5 Tr. at 222-23; *see also* Mar. 14 Tr. at 134-35.)  Failure to satisfy the curricular requirements in a residency program resulted in the transferee taking an adjusted course load to catch up.  (*Id*.)  In compliance with the curricula, residents attended core curriculum conferences, grand rounds, lectures, morbidity and mortality conferences, and journal clubs.  (Mar. 4 Tr. at 159-64; Mar 5 Tr. at 36-39, 146-52, 256-59; Mar. 6 Tr.

at 30-31, 129, 154; Mar. 10 Tr. at 205-06; Mar. 13 Tr. at 23-24, 34-36, 40-41, 158-160; Mar. 14 Tr. at 70-73; Exs. A1, R2, U2, V2, W2, X2, Y2, X2, A3, B3, F3, H5, I5, J5, K5); *Mayo I*, 282 F. Supp. 2d at 1016.  Depending on the residency program, residents also engaged in research projects.  (Mar. 4 Tr. at 246-47; Mar. 5 Tr. at 152; Mar. 6 Tr. at 174-75; Apr. 3 Tr. at 87-89.)  Across all programs, scholarly activity was required of the teaching faculty (sometimes in conjunction with residents), including publication of papers.  (Mar. 10 Tr. at 110.)

Attendance at conferences and lectures was mandatory across all residency programs, and each program monitored attendance, typically through sign-in sheets. (*See, e.g.*, Mar. 4 Tr. at  160, 163, 244; Mar. 5 Tr. at 38-41, 149-50, 258; Mar. 6 Tr. at 129, 154, 185; Mar. 12 Tr. at 86,  88, 129; Mar. 14 Tr. at 70-71; Mar. 13 Tr. at 34-35, 158-9; Mar. 14 Tr. at 71; Apr. 3 Tr. at 79-84; Exs. T2, V4, F5, I9.)  Unexcused absences at conferences and lectures were handled severely, including possible remediation.[36] (*See* Mar. 6 Tr. at 129, 185; *see also* Mar. 12 Tr. at 132 (Dr. Weinberg testifying that program coordinators would follow up with residents who did not    attend conferences to "find out why they didn't show").)   Resident attendance at internal    medicine and cardiology conferences and seminars during the years in question easily exceeded the ACGME-prescribed minimum rate of 60 percent.  (Mar. 12. Tr. at 129-35, 161-62.)

Finally, resident performance was monitored through regular evaluations,[37]

---

[36] Excused absences were recorded where a resident was on another rotation or some other permissible leave.  (Mar. 12 Tr. at 130.). The testimony at trial also revealed that regardless of the basis for an absence, many of the conferences were repeated (*i.e.*, were part of the standard curriculum), so residents were afforded an opportunity to make up a missed seminar or lecture.  (Mar. 12 Tr. at 131; Mar. 13 Tr. at 89.)

[37] The United States failed to support its argument that the resident evaluations were typical performance evaluations.  First, the Court finds that the evaluations uniformly measured, among other things, academic performance and competence.  (*See* Ex. W3 at MS 008730 (Evaluation assessing medical knowledge); *see also* Mar. 6 Tr. at 187 (Dr. Braun testifying that the evaluations were essentially "grades" which determined whether the resident was "accomplishing and doing what [he/she needs] to do to fulfill the requirements of the program").)  Second, the United States presented no factual evidence or expert

quizzes, and tests.  (Mar. 10 Tr. at 110-11; Exs. S3, W3, Z3, G4, L4, 04, U4, Q5 & U5 (evaluations of testifying residents);  Mar. 5 Tr. at 31-32; Mar. 13 Tr. at 85-87; Exs. V2 & W2; Mar. 5 Tr. at  153; Apr. 3 Tr. at 26-27, 70-71, 76; Ex. O6 at MS 063282 (regarding quizzes and evaluation in the Radiology department at Mount Sinai); Mar. 10 Tr. at 211-16 & Ex. J3 (related to Surgery in-training examinations); Mar. 12 Tr. at 137-40 & Ex. L3 (related to Internal Medicine in-training examinations); Apr. 3 Tr. at 77 & Ex. G5 (related to Radiology in-training examinations).)    These records, including the performance evaluation and test grades, were kept on file by each program director (*See, e.g.*, Mar. 10 Tr. at 49; Apr. 3 Tr. at 70; Ex. N6 at MS 063130.)  The Office of Graduate Medical Education retained the original residency program application, GME Program Agreements, and various other required forms (as specified by the ACGME).  (Mar. 14 Tr. at 117-125.)

The existence of so many common features across twelve programs in varying specialties can be attributed to the applicable accrediting organizations, and in particular, the ACGME.  It is an undisputed fact that the ACGME "has been a major force in the standardization of educational curricula across all teaching hospitals."    (JPTS, Uncontested Fact No. 26.)   The former Executive Director of the ACGME, Dr. David Leach, testified at length regarding GME and accreditation   in the United States, accreditation requirements and GME standards.  He further testified in    detail about particular program and sponsoring institution requirements as detailed in the Directory of Medical Education (known simply as "the Green Book").  (Mar. 12 Tr. at 33-71.)    Of the twelve programs at issue in this case, five were accredited by the ACGME (including the

---

testimony from which to compare or contrast the evaluations in evidence.

largest single program, Internal Medicine), which included nearly 79 percent of the enrolled residents.  In total, nine of twelve programs were accredited by their particular accrediting organization, accounting for nearly 96 percent of the residents during the tax years at issue.

Testimony concerning two of the unaccredited programs, the surgical oncology fellowship and the breast imaging fellowship,[38] confirmed, however, that these fellows were subject to a more specialized but largely comparable curriculum, specific in that subspecialty area of training. (Mar. 10 Tr. at 224-28 (surgical oncology); Apr. 3 Tr. at 36-37, 39-40 (breast imaging)).

The two-year surgical oncology fellowship was run by a program director, who was a faculty attending that sub-specialized in surgical oncology.  (Mar 10 Tr. at 224.) The director chose the fellows based on the quality of their applications to the fellowship.  (*Id.* at 225.)  There was a separate curriculum for the surgical oncology fellowship, where the fellows were required to participate in a surgical oncology journal, and there were "a lot of interactions between the faculty members who are the oncology surgeons … in training the residents."  (*Id.* at 225-26.)  In addition, any surgery that the fellow performed "is always with a faculty member."  (*Id*. at 226 ("[T]here is no unsupervised surgery."))   Dr. Thomas Mesko, Mount Sinai's program director for surgical oncology, further testified that he believed he was "teaching" the fellows, and that fellows "were engaged in a course of education with respect to surgical oncology." (*Id.*)   Formal training and completion of the fellowship were necessary in order to become a surgical oncologist, and to become a member of the Society of Surgical Oncologists.  (*Id.* at 227.)   The breast imaging fellowship was a prestigious course of

---

[38] Accreditation was not available at the time in those two specific subspecialties.  (JPTS, Uncontested Fact No. 49; Mar. 10 Tr. at 71.)

study in "women's imaging," which involved six months of training in mammography and six months in ultrasound.  (Apr. 3 Tr. at 36-38 (Dr. Carbonell testified that "[t]en years ago, [Mount Sinai] was at the forefront of doing women's imaging."))  Breast imaging fellows rotated along with radiology residents during the year-long fellowship.  (*Id*. at 91.)  Mount Sinai maintained a one-to-one "teacher-to-fellow ration," just as radiology residents enjoyed a one-to-one ration in their residency program.  (*Id*. at 72-73.)  In the same manner as a radiology resident at Mount Sinai, fellows were constantly supervised by the attending physicians; they did "[n]othing independently."  (*Id*. at 39-40; 72-73.)

Even with respect to Mount Sinai's unique plastic surgery fellowship, the evidence revealed that, consistent with the other eleven residencies, plastic surgery fellows, among other rigors, followed a curriculum created by the program director, were supervised by an attending at all times (in fact, never performed a procedure without direct supervision despite being board-certified in general surgery), and regularly attended educational conferences.  (Mar. 6 Tr. at 23-31.)

Because of the above, I conclude that the United States has neither presented sufficient evidence, nor drawn any significant distinctions, <u>disproving</u> that residents in all of Mount Sinai's residency programs "regularly attended classes" as part of their residency.

### 2.    The Residents' Purpose in Participating in Residency Programs

The United State's central argument is that residents purpose in pursuing graduate medical education was to "earn a livelihood."  (*See, e.g.*, Apr. 3 Tr. at 184, 198-200.)  While it is true that residents, and not medical students, are paid a stipend, I

61

do not find this fact to be conclusive. The greater weight of the evidence does not support that residents pursue graduate medical education to earn a "livelihood." The opposite appears to be true. What residents earn can hardly be called a livelihood, even if benefits are added. Nonetheless, the United States claims that  teaching hospitals pay a stipend as consideration for the resident's care of patients. The argument suffers from a fatal flaw in reasoning – the United States' belief that  patient care and education are mutually exclusive.  They are not.

Beside, many factors support that residents are not typically "employees." For instance, most residents at issue here applied to Mount Sinai through the National Match Program.  (Mar. 14 Tr. at 12-33; *see also* Exs. E2, F2, G2, H2, I2, J2, K2.)  They were not "hired" to perform patient care,[39] Nor were they  subject to the direction and control of the hospital generally or its clinics.  (*See, e.g.*, Mar. 4 Tr. at 158.); *Mayo I*, 282 F. Supp. 2d at 1017.

Moreover, as previously discussed, a structured curricula controlled what residents did, where they did it, and how they did it.  (*See, e.g.*, Mar. 10 Tr. at 34-35, 41-42, 44-45, 52-57, 61-62, 64-66, Exs. JE3, JE5, JE7, L1, N6, O6, Y6, Y1, P7, K7; Mar. 4 Tr. at 158; Mar. 13 Tr. at 65 (Dr. Lang testifying that the emergency department

---

[39] I place significant weight on the expert testimony and  report (Exhibit I8) of  Dr. Jordan J. Cohen, M.D. (Mount Sinai's expert witness). Dr. Cohen's medical and academic qualifications are extraordinary and his opinions are well-reasoned. I  rely on the  opinions of Dr. Cohen  at various times throughout this Opinion. I also rely on the supportive opinions of Dr. Mary M. Cooke, M.D. Collectively, Dr. Cohen's and Dr. Cooke's opinions carry more weight, and are more convincing, than those of  Dr. Earl J. Reidorff, M.D., the United State's primary  expert witness on graduate medical education.

As Mount Sinai's expert,  Dr. Cohen persuasively testified (in support of the resident's status as students and not typical employees) that the terms "hire" and "fire" are misnomers in the case of residents. Such terms imply a traditional economic relationship between employer and employee that does not exist for the teaching hospital. For example, Dr. Cohen testified that certain residents participate in the National Resident Matching Program, which supports  that the relationship of residents to the teaching hospital is educational rather than economic.  The entire matching process is designed for one purpose: to fulfill the educational needs of the student by ensuring the student is matched with the program most suited to his or her needs.  Because the matching program limits the power of the student and the hospital to independently contract, it is distinguishable from a typical hiring process. (Mar. 11 Tr. at 106-08.)

had "sufficient attending physician coverage. . . to run without the residents" because the residents "were supposed to have education [in the emergency department] not just be service oriented")); *Mayo I*, 282 F. Supp. 2d at 1017.  At the end of a rotation, residents moved to their next scheduled rotation, while the attending physician's patients inherited a new set of residents.  (Mar. 4 Tr. at 158.)  Thus, the lone impetus for the training received by Mount Sinai's residents was the mandatory, educational curriculum.  Moreover, that curriculum was administered and supervised by teaching faculty at Mount Sinai.  (*See, e.g.,* Mar. 5 Tr. at 128; Mar. 10 Tr. 210-11; Mar. 12 Tr. at 95; Mar. 13 Tr. at 57-58.)

    The rigid nature of the program curricula is critical.  Regardless of the medical specialty or PGY level, residents remained subject to their program curricula and the supervision of the faculty attendings at Mount Sinai.  (*See, e.g*, Ex. R6; Mar. 4 Tr. at 166, 252; Mar. 5 Tr. at 236; Mar. 6 Tr. at 27, 140; Mar. 10 Tr. at 51, 117, 208, 221-22; Mar. 14 Tr. at 77; Apr. 3 Tr. at 40, 129-130.)  Likewise, compliance with the curricula did not vary based on a resident's eligibility to sit for the boards in a medical specialty or subspecialty.  (*See e.g.*, Mar. 6 Tr. at 152-153 (Dr. Braun followed Cardiology curriculum despite being board eligible in internal medicine); Mar. 13 Tr. at 29-31 (Dr. Gotkin followed sleep disorders curriculum despite being board certified in internal medicine, pulmonary and critical care); Mar. 6 Tr. at 17, 27-31 (Dr. Van Gent followed plastic surgery curriculum despite being board certified in general surgery.).)

    I highlight this latter point in response to the United States' argument that  certain residency programs were possibly less worthy of the Student Exception than others.  (Apr. 3 Tr. at 202-205.)  The fact that residents were <u>required</u> to complete certain residency programs (indeed the majority in Mount Sinai's case) before a resident could

63

sit for that specialty's certifying board examination constituted the primary impetus for enrollment in    Mount Sinai's residency program.  (*See, e.g,* Mar. 4 Tr. at 117; 227; Mar. 5 Tr. at 112, 223; Mar. 13 Tr. at 16-18.)   The accrediting organizations required completion of the program and the mandatory years of training.  (*See* Mar. 10 Tr. at 23.) However, whether a program was  accredited and whether a resident had to complete a requisite number of years to attain board eligibility speaks to the reason for enrollment and the source of the curricular requirements.   The conditions for continuation in a residency program at Mount Sinai were uniform, *i.e.*, residents were required to comply with the established curriculum.   Put differently, once enrolled at Mount Sinai, the residents joined their class for the academic year, engaged in the prescribed curriculum, and were subject to the model of progressive supervision (as discussed further below).

For the same reason, the achievement of state licensure in Florida failed to create a distinguishable basis in the "student" inquiry.  An acknowledged benefit of state licensure was a resident's ability to moonlight.   (*See, e.g.,* JE 3 at MS 002504.) However, the experiences gained while moonlighting did not change the curricular requirements of the resident; Mount Sinai provided no credit for time spent or patients seen.  (*See* Mar. 6 Tr. at 146-48; *see also id*. at 204 (confirming no credit was provided toward fellowship because that curriculum was "sacrosanct").)   Residents were not permitted to moonlight at a Mount Sinai facility or practice in their specialty or subspecialty area of training.  (*See, e.g.,* Mar. 5 Tr. at 125; Mar. 6 Tr. at 146; Ex. L1 at MS 000851 (permitting moonlighting for Cardiology fellows only "outside the purview of the cardiology training program.")); *see Mayo I*, 282 F. Supp. 2d at 1017.    Also, residents testified that they engaged in moonlighting in order to earn extra money; not

for the training in their chosen specialty.  (*See, e.g.,* Mar. 6 Tr. at 142, 146-48; Mar. 13 Tr. at 27); *Mayo I*, 282 F. Supp. 2d at 1017.[40]

Likewise, the United States failed to establish evidence that any Mount Sinai resident had the expectation of continued employment following completion of their residencies. *Mayo I*, 282 F. Supp. 2d at 1017; *see also Bingler v. Johnson*, 394 U.S. at 751, 757 (1969) (finding employee status under IRC § 117 based largely on fact that those in work-study program were obligated to return to Westinghouse's employ after completion of their leave).  In fact, Mount Sinai's residents uniformly affirmed they had no such expectation of continued employment at Mount Sinai.  (*See, e.g.,* Mar. 4 Tr. at 132, 233; Mar. 5 Tr. at 164, 231; Mar. 6 Tr. at 142.)  *Mayo I*, 282 F. Supp. 2d at 1017.

Finally, the former residents almost universally testified "that their purpose in enrolling in a residency program at Mount Sinai was <u>educational</u> – to gain the knowledge and skill necessary to practice in a specialty area of medicine."  (*See, e.g.,* Mar. 4 Tr. at 233; Mar. 5 Tr. at 126, 227; Mar. 6 Tr. at 25, 135; Mar. 13 Tr. at 32-33, 146); *Mayo I*, 282 F. Supp. 2d at 1017 (emphasis added).  At the same time, they confirmed that their purpose in enrolling in Mount Sinai's residency programs was <u>not</u> to earn a livelihood.  (*See, e.g.,* Mar. 4 Tr. at 233; Mar. 5 Tr. at 126; Mar. 6 Tr. at 141.)  No resident chose his or her residency due to the stipend offered.  (Mar. 14 Tr. at 201;. *see also* Mar. 4 Tr. at 130-31; Mar. 5 Tr. at 228; Mar. 6 Tr. at 30, 142; Mar. 13 Tr. at 155-56; Mar. 14 Tr. at 52.)  It was neither a competitive wage nor bargained-for compensation, and represented a far cry from the salaries drawn by fully trained and licensed

---

[40]  I do not find persuasive, and give no weight to the opinion of Dr. Reisdorff, who attempted to equate the learning in a residency program to the lifelong learning experienced by a practicing physician.  (Mar. 3 Tr. at 200-02.)  As Dr. Cohen testified, there is a distinct and critical "difference between the learning that a fully trained physician experiences during the course of daily practice and the kind of structured curriculum-driven learning that a resident engages in during formal education."  (Mar. 11 Tr. at 127; *see also id*. at 78-79.)

physicians.  (*See, e.g.,* JPTS, Uncontested Fact No. 41; Mar. 6 Tr. at 195; Mar. 10 Tr. at 30; Mar. 13 Tr. at 26-28, 45-46; Mar. 14 Tr. at 53.)  I conclude that the residents' testimony overall was compelling and not self-serving. Most of them appeared reluctantly and by subpoena on behalf of the United States.

### 3.    The Performance of Services as an "Incident to and for the Purpose of Pursuing a Course of Study"[41]

I conclude that the United States has failed to prove that patient care services provided by residents were not "incident to and for the purpose of pursuing a course of study." The singular source of testimony on this issue came from Dr. Reisdorff, who opined that the major "tipping point" as "student" status occurs "their first day of internship, first day of residency."  (Mar. 3 Tr. at 161-62.)  In fact, Dr. Reisdorff went so far as to say that the change from undergraduate medical student to PGY-1 is "the biggest transition in the life of the physician."  (Mar. 3 Tr. at 162.)

Dr. Reisdorff's opinion, treating patient care and education as mutually exclusive concepts, is contrary to the greater weight of the more persuasive evidence and expert opinions.   Dr. Reisdorff simply assumed that most, if not all, patient care is not educational.  (*See* Mar. 3 Tr. at 240-41; Mar. 4 Tr. at 16-18.) When pressed, Dr. Residorff himself admitted that he struggled to separate patient care and education. (Mar. 3 Tr. at 160.)

---

[41].  I conclude that the United States misconstrues the analysis of whether "services" performed by residents were "incident to and for the purpose of" pursuing a course of study. The United States ignores this factor in its "student" inquiry, stating that the work is the course of training or study.  But, the terms "work" and "services" are obviously not the same. The relevant term here is "services," not "work." In any event, the preponderance of the evidence establishes that education at Mount Sinai during the tax years in question could not be separated *from services*. Although the Government spends a considerable amount of time in its argument on whether education or services "predominates," the applicable test is not based on "primary function" and the amended regulation. See discussion at footnote 21. Rather, the proper inquiry under the applicable regulations is whether the services performed were required by the residency program curricula -*i.e.* the course of study-which, the evidence establishes here, was the case.

Dr. Reisdorff's claim that the "tipping point" occurs at the outset of a residency appears to lack any general acceptance in the graduate medical education community. In the words of Dr. Cohen, the tipping point hypothesis is "idiosyncratic" – meaning that Dr. Reisdorff is in a "company of one" with respect to his unusual theory.  (Mar. 11 Tr. at 101-02 (Dr. Cohen testifying that Dr. Reisdorff's view was one that he "had never heard expressed by anybody before," and characterizing his tipping point theory as "quite bizarre")).  As Dr. Cohen also testified, rotations through patient wards begins in the third year of undergraduate medical school.  (Mar. 11 Tr. at 115-116.)  Those rotations continue through the fourth year of medical school and into the PGY-1 year.  (Mar. 11 Tr. at 116-117.)  Thus, there is little to distinguish the manner of learning for the third or fourth-year medical student and the first year resident.  (*See id.*)

With respect to supervision of  residents, the evidence does not support Dr. Reisdorff's allegations of "unsupervised" patient care at Mount Sinai.   In fact, Dr. Reisdorff admitted he has no independent knowledge of Mount Sinai's residency programs and, though available for his review, did not review any resident depositions in preparing opinions for this case.  (*See* Mar. 3  Tr. at 194.)  Instead, the evidence established that Mount Sinai employed a model of "progressive responsibility," as also mandated by the applicable accrediting organizations.  (*See, e.g.,* Mar. 10 Tr. at 117-18, 203-04; Ex. R6; JPTS, Uncontested Fact No. 52.)   In short, a resident progresses through his levels of training, accepting increasing amounts of responsibility, yet such progressive responsibility is always subject to the supervision of the attending physician.  (*Id.*;   *see also* Mar. 11 Tr. at 54-55, 118.)  Based on the greater weight of the evidence, I conclude that this model of progressive    responsibility is the most appropriate way to

produce competent, fully-trained physicians in their particular specialty.  (Mar. 11 Tr. at 117.)

I join the reasoning of *Mayo I* in finding little merit in the United State's position that such patient care responsibility  was not "incidental" to the residents' education. As noted in  *Mayo I*  "Time alone cannot be the sole measure of the relationship between services performed and a course of study." Here, as in *Mayo I*, "[u]nrebutted evidence establishes that large portions of the patient-care services performed by residents . . . were repeated by the supervising staff physicians who were ultimately responsible for the patients' care."  *Id.*  (*See* Mar. 10 Tr. at 184-86; *see also* Mar. 5 Tr. at 45 (the "attending physician . . . oversaw all decision-making and final decision-making regarding patient care."); Mar. 6 Tr. at 156 (Dr. Braun testifying that in the Cardiology fellowship program the attendings were the "final arbiters of the patient's care"); Mar. 11 Tr. at 78-79 (Dr. Cooke stating that when a resident is making rounds, she as the attending is "separately . . . seeing the patients" and making her own assessment.); Mar. 12 Tr. at 122 (Dr. Weinberg testifying that "the attending faculty is ultimately responsible for the patient.") In sum, the more convincing and compelling conclusion is that patient care was incidental to the residents' educational courses of study at Mount Sinai.  The greater weight of the  evidence demonstrates that Mount Sinai's residents enrolled in the residency programs to obtain an education pursuant to an organized an rigorous course of study in their chosen specialty.

### V. CONCLUSIONS AND ORDER FOR PARTIAL JUDGMENT

Based on the foregoing,  **IT IS ORDERED, ADJUDGED** that

1.      Mount Sinai Medical Center of Florida, Inc. is, within the meaning of 26 U.S.C. § 3121(b)(10), a "school, college, or university."

2.      Medical residents at Mount Sinai between 1996 and 1999 were "employed" by Mount Sinai, within the meaning of 26 U.S.C. § 3121(b)(10).

3.      Medical residents at Mount Sinai between 1996 and 1999 were "students" within the meaning of § 3121(b)(10), enrolled in and regularly attending classes at Mount Sinai.

4.      The FICA taxes at issue paid on stipends awarded from 1996 through 1999 are not in Mount Sinai's possession.  Instead, Mount Sinai repaid to the United States the refunded FICA taxes, plus appropriate interest to date, while Mount Sinai pursued appeal of this Court's adverse summary judgment ruling (Dkt. No. 72.)  Upon reversal of summary judgment by the Eleventh Circuit and remand to this Court for trial, the United States' retained possession of the refunded FICA taxes.  (*See also* JPTS, Uncontested Fact No. 23.)  Accordingly, Mount Sinai shall recover from the United States the sum of $2,450,177.32, plus interest paid, plus interest thereon from the date of payment by Mount Sinai to the present, to be computed in the manner provided by 26 U.S.C. § 6611.  (*See* JPTS, Uncontested Fact No. 21.)

5. Partial judgment is entered for Mount Sinai, and against the United States, on Count I of the Amended Complaint to the extent stated above. The Court retains jurisdiction to further consider at a subsequent evidentiary hearing the allegations set forth in Paragraph 14 of the Amended Complaint. Thereafter, the Court will enter a final judgment.

**ORDERED** this 28th day of July, 2008, in Miami, Florida.

_____
ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

c.c. Counsel of Record via electronic filing